HELEN E. JORDAN

*vs.*

KENNETH N. MACE

Hancock.    Opinion, November 19, 1949.

*William S. Silsby,* for complainant.

*Blaisdell and Blaisdell,* for respondent.

SITTING: MURCHIE, C. J., THAXTER, FELLOWS, MERRILL, NULTY, WILLIAMSON, JJ.

WILLIAMSON, J. The respondent in a bastardy action was found by a jury to be the father of twins. His motion for a new trial is sustained.

The issue is: Is the verdict manifestly wrong in the light of biological law and of evidence of exclusion of paternity based upon the blood grouping tests taken under R. S., Chap. 153, Sec. 34?

On October 23, 1945 the complainant had sexual intercourse with the respondent. On November 1 she told the respondent that she had missed her monthly period and that she thought she was pregnant. The twins were born on June 27, 1946. When asked if she had accused anyone else of being the father, she replied, "No, I haven't. There is no other one to accuse." The respondent discussed marriage and other matters with the complainant in a manner consistent only with a belief that he was responsible for her condition.

Pursuant to orders of court, blood specimens were taken and collected by two local physicians, and submitted by them to Dr. Hooker of Boston "for said blood grouping tests for the purpose of determining whether or not the paternity of the respondent can be excluded." Blood specimens were taken on July 31, 1947 for the first test and on February 25, 1948 for the second test. The physicians testified about the manner in which the blood specimens were taken and prepared for shipment, and one physician testified about mailing the specimens to Dr. Hooker by registered mail. Their qualifications were not questioned.

Dr. Hooker, whose qualifications were admitted, and who, in the words of the court in *Jordan* v. *Davis*, 143 Me. 185; 57 A. (2nd) 209, 210, is "one of the leaders" in research work relating to the exclusion of paternity by blood grouping tests, stated the results of the tests made by him or at least under his direction and the conclusions he drew therefrom based upon biological law.

The tests to determine the group and type of the blood were performed eleven times. The results in each instance were, as follows:

| | Group | Type |
|---|---|---|
| Complainant | A | M |
| Child A | A | M |
| Child B | A | MN |
| Respondent | A | N |

Dr. Hooker gave his opinion, based on the two following reasons, that the respondent could not be the father of the twins:

> First, by the operation of the biological law, sometimes called "the blood test law," a parent with blood of type "N" can not have a child with blood of type "M", and thus respondent's paternity of Child A was excluded.

> Second, the father of twins must be one and the same man.

It is not necessary for decision in this case that we accept, reject or consider Dr. Hooker's testimony with respect to his second reason. The verdict that the respondent is the father of the twins is indivisible. If paternity of one child is excluded, the verdict may not stand. We, therefore, consider in reaching our decision only the biological law relating to exclusion of paternity by blood grouping tests.

Our court has stated in *Jordan* v. *Davis, supra,* with reference to the blood grouping tests:

> "It is not here necessary to discuss the intricate details by which science has reached certain definite conclusions founded on biological laws. We are told that by the examination of the blood of the mother, the child, and the putative father, non-paternity may be conclusively proved in a certain proportion of cases. The statute in question accepts this verdict of science,—that even though such tests cannot prove paternity, they may in certain instances disprove it."

"We are not disposed to close our minds to conclusions which science tells us are established. Nor do we propose to lay down as a rule of law that the triers of fact may reject what science says is true; for to do so would be to invite at some future time a conflict between scientific truth and stare decisis and in that contest the result could never be in doubt."

Discussion of the scientific basis of the blood grouping tests, with charts illustrating the blood groupings and types, may be found in 163 A. L. R., 939 n., 941, in 23 American Bar Association Journal, 472 (1937), and in 34 Cornell Law Quarterly, 72 (1948).

The three physicians named by the court to conduct the tests stated in detail the manner in which their duties were performed from the taking of the blood through the repeated tests to the making of the reports. Their testimony discloses great care was taken at all stages. The possibility of error was minimized by the making of two complete blood tests at intervals of time. Eleven tests by or under the direction of Dr. Hooker produced identical results.

What further safeguards could reasonably have been taken to protect the integrity of the tests? If the jury may disregard the fact of non-paternity shown here so clearly by men trained and skilled in science, the purpose and intent of the Legislature, that the light of science be brought to bear upon a case such as this, are given no practical effect.

*Jordan* v. *Davis, supra,* is not authority for the proposition that a jury may give such weight as it may desire to biological law. Such a law goes beyond the opinion of an expert. The jury has the duty to determine if the conditions existed which made the biological law operative. That is to say, were the tests properly made? If so made, the exclusion of the respondent as father of one child follows irresistibly.

The basis of the decision in *Jordan* v. *Davis, supra,* is clearly set forth in the last paragraph of the opinion, as follows:

> "Believing as we do that the jury could in considering all the testimony have rejected the accuracy of the blood grouping tests in this instance, we cannot say that their finding is manifestly wrong."

The absence of evidence that anyone else could have been the father should not react to the disadvantage of this respondent. He presented clear and precise tests which excluded paternity under biological law.

By the very nature of such a case evidence excluding the possibility of opportunity for another to be the father is limited to the statement of the complainant. No corroboration of total lack of opportunity could well be expected. On the part of the respondent, chance alone would produce evidence tending to show acts of intercourse by another with the complainant within the limited period.

The blood grouping test statute was enacted to provide, in our view, for the very situation in which a respondent, as a matter of ordinary proof without the tests, can do no more than create a doubt about the paternity of a child. Exclusion of paternity by blood grouping tests under biological law is scientific proof that a respondent is not the father.

The skill and accuracy with which the blood grouping tests were here conducted were clearly and convincingly demonstrated by the testimony of disinterested witnesses. There is nothing in their testimony which even casts suspicion upon the accuracy of the findings or the consequent exclusion of the respondent as the father of Child A.

The statement by the complainant, "There is no other one to accuse," even if interpreted as a denial of intercourse

with any man other than the respondent, is not sufficient to overcome the overwhelming effect of this positive testimony by disinterested witnesses.

If the jury found that the results of the blood grouping tests were inaccurate, such finding must have been based on mere conjecture or understandable sympathy for the complainant and prejudice against the respondent. Such finding is not supported by any believable evidence in the record. The motion must be sustained.

In addition to the motion for a new trial, the respondent has presented exceptions to certain rulings of the presiding justice. The bill of exceptions taken alone does not clearly and succinctly set forth the case and the issues, the materiality of the points raised, or the erroneous or prejudicial character of the rulings. The evidence is not incorporated therein. The court cannot look outside the bill of exceptions. *Moores* v. *Inhabitants of Town of Springfield,* 143 Me. 415; 62 A. (2nd) 210. The exceptions are not properly before us. In view of our decision upon the motion for a new trial, it would be unnecessary to consider the exceptions were they properly presented. Accordingly, there is no necessity of remanding the case for correction of the bill of exceptions under R. S., Chap. 91, Sec. 14, as in the *Moores* case.

We find no merit in the suggestion of the respondent that the court was without jurisdiction to hear the cause for the reason there should have been a separate action for each child. Under R. S., Chap. 153, Sec. 29, after the respondent has been adjudged to be the father, he stands charged, under order of court, with maintenance, with the assistance of the mother, and with payment of costs, expenses and support to the date of rendition of judgment. We see no reason why the court may not provide for the needs and necessities of one child or more by appropriate action.

The first step in a bastardy action is the accusation by "a woman pregnant with a child, which, if born alive, may be

a bastard, or who has been delivered of a bastard child." R. S., Chap. 153, Sec. 23. One accusation is obviously sufficient when made during pregnancy. We see no reason why duplication of an accusation should be required against a respondent, when made as here, after the birth of twins.

If a more narrow reasoning is required, we point to R. S., Chap. 9, Sec. 21, II, which says:

> "The following rules shall be observed in the construction of statutes, unless such construction is inconsistent with the plain meaning of the enactment.

> "Words of the singular number may include the plural; - - - -"

The entry will be

*Motion sustained.*

*New trial granted.*