STATE OF NORTH CAROLINA v. RONALD JUNIOR COTTON

No. 8815SC1152

(Filed 7 August 1990)

1. **Criminal Law § 85.3 (NCI3d) — rape — evidence of sexual harassment at work — admissible**

    The trial court did not err in a prosecution for first degree rape, first degree sexual offense, and first degree burglary by admitting evidence that defendant had touched female employees in a sexually offensive manner and had made sexually offensive comments to female employees. Although the State would have not been allowed to introduce this evidence in the first instance, the trial court did not err in allowing the State to rebut defendant's evidence of a good employment record.

    **Am Jur 2d, Evidence § 321; Rape §§ 71, 75.**

2. **Criminal Law § 85.3 (NCI3d) — rape — sexually offensive conduct at work — victims at work similar to rape victims — no prejudice**

    There was no prejudice in a prosecution for first degree rape, first degree sexual offense, and first degree burglary from the admission of testimony that the victims here were of the same race and of similar ages of waitresses at defendant's place of employment who had been the victims of defendant's offensive touching and offensive language. Although the ages and race of the female employees were not relevant to rebutting the defendant's evidence that he was a good employee, there was no reasonable possibility that exclusion of the ques-

tioned evidence would have caused the jury to reach a different verdict.

**Am Jur 2d, Evidence § 321; Rape §§ 71, 75.**

3. **Criminal Law §§ 50, 66.1 (NCI3d)— identification—expert testimony excluded—no error**

The trial court did not err in a prosecution for first degree rape, first degree sexual offense, and first degree burglary by excluding defendant's expert witness on identification where the court found that the evidence was relevant but of no more than minimal value to the jury and that admission of the evidence would be unduly prejudicial in defendant's favor. Moreover, the court charged the jury that it should consider many factors such as stress, lighting, and race which the expert witness included in his voir dire testimony. N.C.G.S. § 8C-1, Rule 403.

**Am Jur 2d, Expert and Opinion Evidence § 278.**

Judge JOHNSON dissenting.

APPEAL by defendant from Judgment of *Judge D. Marsh McLelland* entered 25 November 1987 in ALAMANCE County Superior Court. Heard in the Court of Appeals 11 May 1989.

*Attorney General Lacy H. Thornburg, by Associate Attorney General Debra C. Graves, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender David W. Dorey, for defendant appellant.*

COZORT, Judge.

The primary question presented by this appeal is whether the trial court committed reversible error when it allowed the State to introduce testimony from the defendant's employer that the defendant, who was on trial for rape and other offenses, had touched female employees in a sexually offensive manner and had made sexually offensive comments to the female employees. Under the particular facts of this case, we find no reversible error.

The defendant was charged with two counts of first-degree rape, two counts of first-degree sex offense and two counts of first-degree burglary. The names of the victims are not necessary

for the resolution of this appeal; they shall be referred to as the first victim and the second victim. The crimes for which the defendant was charged occurred in the early morning hours of 29 July 1984. In January of 1985, the defendant was tried for and convicted of one count each of first-degree burglary, first-degree rape and first-degree sex offense involving the first victim. On appeal to the North Carolina Supreme Court, the defendant was awarded a new trial. *State v. Cotton*, 318 N.C. 663, 351 S.E.2d 277 (1987). The matter came on for trial again at the 9 November 1987 session of Alamance Superior Court, where the defendant was tried for the offenses involving both victims.

The State offered evidence tending to show that at approximately 3:00 to 3:30 a.m. on Saturday, 29 July 1984, the first victim was awakened by an intruder in her bedroom. The intruder jumped on her, put his hand over her mouth and held a knife to her throat. The intruder pulled the first victim's underwear off, held her legs down and performed oral sex on her. The intruder sucked her breasts, tried to kiss her, and penetrated her vagina with his penis four or five times. The intruder stayed in the first victim's apartment for about 30 minutes. She was able to escape by running out the back door and running to a nearby apartment.

Two days later, the first victim went to the police station where she viewed a photographic lineup containing six photos. She identified the defendant as her assailant. On 8 August 1984, the first victim participated in a live lineup where she again selected the defendant as her assailant.

The second victim testified that she was asleep on the couch in her den during the early morning hours of 29 July 1984 when she was awakened at about 5:00 a.m. by a draft on her feet. She looked up and saw a man in her house. When she sat up, the man fondled her breasts. The man went out the back door and around the house. The second victim went over to close a window, but the man reached through the window and pulled down the top of the garment she was wearing. She tried to use the phone, but it went dead. The man crashed through the front door and grabbed the second victim. The man pushed her down the hall to a bedroom, pulled off her clothes, threw her on the bed and sucked on her breasts. He licked her stomach and her vagina, and then crawled on top of her, putting his penis in her vagina. The man then left through the front door, after having been in

the second victim's house for 20 to 30 minutes. The second victim then ran out of her house to a neighbor's house.

Two days later the second victim was shown a photographic lineup containing six photographs of black men. She was unable to pick out her assailant. The defendant's photograph was included in the array shown to the second victim. On 8 August 1984, the second victim participated in a live lineup, viewing seven black males. She wrote down the number of the man standing next to the defendant. The second victim testified she recognized the defendant as her assailant; however, she wrote down the wrong number because she was scared that the defendant, who could see her during the lineup, would get loose and kill her if she identified him. In court, she identified the defendant as her assailant.

The defendant relied on mistaken identification and alibi. Both victims were cross-examined extensively about their ability to see well enough in the reduced light to identify the assailant. The defendant produced witnesses who testified that defendant was at his mother's house asleep on the sofa on the morning of 29 July 1984. The defendant testified that he went to sleep on the sofa at his mother's house at about 3:00 a.m. on 29 July 1984 and did not get up until around noon the next day. The defendant testified that he had a prior conviction of assault on a female with intent to commit rape and a prior conviction of breaking and entering.

Defendant was convicted of one count of first-degree rape, one count of first-degree sex offense, one count of second-degree rape, one count of second-degree sex offense, and two counts of first-degree burglary. Defendant was sentenced to a total term of imprisonment of life plus 54 years at expiration. Defendant appealed.

[1] In his first assignment of error, the defendant contends the trial court erred by allowing testimony from the defendant's employer that the defendant touched waitresses "on their shoulders, and their bodies, and their rears," and talked to two of the waitresses "about sex." The witness further testified that the waitresses were white and that the two to whom the defendant talked about sex were 18 and 47. The defendant contends the admission of the evidence was prejudicial error, especially when considering that the first victim was a white 22-year-old female and the second victim was

STATE v. COTTON

[99 N.C. App. 615 (1990)]

a white 41-year-old female, and the defendant is black. We find no reversible error.

The defendant's employer, a restaurant manager, testified for the State that defendant, a dishwasher at the restaurant, had worn clothes the same as or similar to the clothes worn by the man who committed the crimes against both victims on 29 July 1984. On cross-examination, defendant's counsel asked: "Was Mr. Cotton a good employee for you, sir?" The witness answered: "Yes." On redirect, over defendant's objection and after a voir dire, the witness was allowed to testify: "[The defendant] was always messing with the waitresses . . . touching them . . . on their shoulders, and their bodies and their rears, and telling dirty jokes." The witness testified that the defendant directed his comments "about sex" to two white waitresses, ages 18 and 47.

The defendant contends that the evidence was not admissible under N.C. Gen. Stat. § 8C-1, Rule 404(a)(1). The defendant further argues that, even if the evidence did have some probative value, it should have been excluded under Rule 403 because the danger of unfair prejudice to the defendant substantially outweighed any probative value of the evidence. We do not agree.

Rule 404(a)(1) provides for the admission of character evidence of the accused when the testimony concerns "evidence of a pertinent character trait of his character offered by an accused, or by the prosecution to rebut the same." In *State v. Squire*, the North Carolina Supreme Court held that "pertinent" was tantamount to "relevant," making the key determination "whether the trait in question is relevant; i.e., whether it would 'make the existence of any fact that is of consequence to the determination of the action' more or less probable than it would be without evidence of the trait. N.C.G.S. § 8C-1, Rule 401." 321 N.C. 541, 547-48, 364 S.E.2d 354, 358 (1988). Character evidence must be tailored to those pertinent traits which are "relevant in the context of the crime charged." *Id.*

Defendant was charged with two counts of burglary, two counts of rape and two counts of sex offense. His employment record had no relevance to any of those offenses. Thus, neither the defendant's evidence that he was a good employee nor the State's rebuttal evidence of his bad conduct toward fellow employees was admissible under Rule 404(a)(1). Nonetheless, "[o]ur courts will allow the State to introduce evidence, even when it is not otherwise admis-

sible, if it is 'offered to explain or rebut evidence elicited by the defendant himself.' " *State v. Fultz,* 92 N.C. App. 80, 85, 373 S.E.2d 445, 448 (1988) (quoting *State v. Albert,* 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981) ). Therefore, while the State would not have been allowed to introduce, in the first instance, evidence of the defendant's bad conduct toward fellow employees, we hold that the trial court did not err in allowing the State to rebut the defendant's evidence of a good employment record.

[2] Our next inquiry is whether the trial court went too far, however, in permitting the State to elicit testimony that the offensive touching and offensive language was directed toward waitresses of the same race and similar ages of the victims who testified. We agree with the defendant that the ages and race of the female employees in question was not relevant to rebutting the defendant's evidence that he was a good employee. Not every evidentiary error, however, entitles the defendant to a new trial. The defendant must show that the error was prejudicial, i.e., he must show there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial. N.C. Gen. Stat. § 15A-1443(a).

Defendant contends the error was prejudicial because the similarity between the ages and race of the victims and that of the waitresses invited the jury to infer guilt based on improper inferences and appealed to "the still pervasive and deeply ingrained prejudices that permeate the subject of interracial sexual interactions." We do not agree. First, the first victim's identification of the defendant as her assailant was certain and largely unimpeached under extensive cross-examination. Second, the second victim's identification, while not as strong as that of the first victim, was nonetheless substantial evidence which pointed to the defendant as her assailant. The defendant's alibi witnesses gave inconsistent accounts of the defendant's whereabouts at the crucial times, and the defendant's initial statement to investigators concerning his activities on the days in question was totally inconsistent with his trial testimony concerning his activities on those days. Furthermore, defendant testified that he pled guilty in 1980 to assault on a female with intent to commit rape and that he pled guilty in 1983 to breaking and entering. Upon review of these factors and the remainder of the record in this case, we conclude that the admission of the evidence of the ages and race of the waitresses was not prejudicial error. We are not of the opinion that there

is a reasonable possibility that exclusion of the questioned evidence would have caused the jury to reach a different result. The defendant's first assignment of error is overruled.

[3]  In his second assignment of error defendant contends the trial court erred in excluding testimony from an expert witness on identification. The defendant offered the testimony of Dr. Reed Hunt, a professor of psychology engaged in research in human memory. Upon the State's objection, the trial court conducted a voir dire, during which Dr. Hunt testified that he had studied the testimony of the two victims and other portions of the trial transcript and the record. Dr. Hunt testified that it was his opinion that there were certain factors present which affected the eyewitness identification. He listed lighting, stress, cross-racial identification, priming of memory, unconscious transfer, and loss of memory over time as factors affecting the identification. At the conclusion of the voir dire, the trial court sustained the State's objection to Dr. Hunt's testimony. We find no error.

This court has held that the admission of expert testimony regarding memory factors is within the trial court's discretion, and the appellate court will not intervene where the trial court properly appraises probative and prejudicial value of the evidence under Rule 403 of the Rules of Evidence. State v. Knox, 78 N.C. App. 493, 495-96, 337 S.E.2d 154, 156 (1985). In ruling to exclude the proffered testimony below, the trial court stated:

> The court is of the opinion that the factors effecting [sic] eyewitness identification of one accused of a violent crime . . . are commonly recognized as relevant and are not so uncontroverted and misapprehended by lay persons as to make expert testimony concerning their application of more than minimal value and assistance to a jury.
>
> Emphasis on the frailty of human perception presented by an unbiased expert in such matters, in itself, constitutes an argument of potentially substantial weight in favor of the accused. This court is of the opinion that the proposed evidence is relevant but that its admission would be unduly prejudicial in the defendant's favor and the objection to admission is, therefore, sustained.

The trial court's statement indicates that the court found the evidence to be relevant; however, the court also found the evidence

to be of no more than minimal value and assistance to the jury. The court then found that the admission of the evidence would be unduly prejudicial in the defendant's favor. We find that the trial court properly appraised the probative and prejudicial value of the evidence, and we hold that the court, in the exercise of its discretion under Rule 403, could exclude Dr. Hunt's testimony. We also observe that, in its charge to the jury, the trial court instructed the jury that, in making a determination as to the validity of an identification, the jury should consider many factors, including stress, lighting, whether it is more difficult to identify one who is a member of another race, and some of the other factors Dr. Hunt included in his voir dire testimony.

In summary we find the defendant's trial to be free of prejudicial error.

No error.

Judge GREENE concurs.

Judge JOHNSON dissents.

Judge JOHNSON dissenting.

I respectfully dissent from the majority's opinion that the erroneous admission of evidence of the race and ages of waitresses defendant directed offensive touching and language toward was nonprejudicial. The test for prejudicial error is whether there is a reasonable possibility that the evidence complained of contributed to the conviction. *State v. Milby*, 302 N.C. 137, 273 S.E.2d 716 (1981).

The complained of evidence was introduced during the following colloquy. For the sake of brevity, defendant's objections and the court's rulings have been omitted.

Q. Mr. Byrum, Mr. Moseley asked you previously about whether or not Mr. Cotton was a good employee of yours; is that correct?

A. Yes, sir.

Q. Now, during the time Mr. Cotton was in your employ, did you have occasion to personally witness any problems with Mr. Cotton, while he was working for you?

STATE v. COTTON

[99 N.C. App. 615 (1990)]

A. Well, the one problem was with the waitress [sic]; it wasn't with doing his job.

Q. What kind of problem was it with the waitresses Mr. Byrum?

A. He was always messing with them.

Q. How do you mean, "messing with them," Mr. Byrum?

A. Touching them.

Q. Touching them where?

A. On their shoulders, and their bodies, and their rears, and telling dirty jokes.

Q. The shoulders, the bodies, and rear?

A. Yes, sir; different places.

Q. And how often did this go on, Mr. Byrum?

A. He touched about every Friday and Saturday night.

Q. And he only worked on Friday and Saturday nights; is that correct?

A. Yes, sir; unless I called him in on Thursday nights.

Q. All right; and how old were the waitresses, Mr. Byrum?

A. They usually run like high school; up to 50, 55.

Q. So, well, in particular, at the time that he was working for you, you had waitresses there between the ages of what, would you say?

A. 18 and 55.

Q. And, in particular, the waitresses that you—that he was touching on the rear end and touching on the shoulder; how old were they?

A. Between the same ages; it was not just—

A. It was not just one waitress; it was just about all of 'em [sic].

Q. And, other than the touching them on the rear, and on the body, did he do anything else with respect to those waitresses? [sic]

A. I said, "No," sir.

Q. Did he say anything to these waitresses?

A. Yes, sir.

Q. And what kind of things were they? [sic]

A. Usually about sex; I don't remember, you now [sic], word for word what it was; but it was always pertaining to that subject.

Q. And did that also pertain to all of the waitresses, and not just one or two?

A. Well, it was two, more than anybody else.

Q. All right, and do you recall the ages of those two waitresses?

A. One was like 18; and one was 47, I believe.

. . . .

Q. What was the race of these waitresses?

A. White.

The threshold question in the case was one of identity. The evidence presented by the State was far from overwhelming. The only evidence presented by the State that had strong probative weight was the identification testimony of the two victims. The force of that evidence was significantly impugned, particularly by other evidence of record not set out in the facts of the majority opinion.

First, as to victim one, the evidence also tended to show that she was nearsighted and was not wearing her glasses during the attack upon her, and the only illumination in the room was from a street lamp filtering through her blinds; that during the time her assailant was in her presence he made efforts to keep her from seeing his face; that upon viewing a photographic lineup on 31 July containing six photos, one of which was of defendant, she initially chose two pictures from the array, one of which depicted defendant. After examining those two pictures for a number of minutes, she told the investigating officer that defendant's photo "looks most like him." On 8 August, she viewed a physical lineup consisting of seven men. Defendant was the only participant whose picture had been among those in the photographic array. Again, the victim was instructed to choose the one that looked the most like her assailant. After viewing the participants for a while, she

told the officer that it was between participants numbers four and five. She then stated that number five, defendant, "looks the most like him."

As to the second victim, the evidence also tended to show that on the two occasions that the assailant entered her house he directed the beam of a flashlight in her face; that other than the flashlight beam the only source of light in the house was from a television set which was not on when her attacker entered the second time. On 31 July, the second victim viewed the same photographic lineup of six photos, including defendant's photo, that the first victim had viewed. Likewise, she was told to pick out the photo of the individual who most resembled her assailant. She failed to pick out anyone from this array. When she viewed the physical lineup on 8 August 1984, and picked out a Kenneth Watkins as her attacker, she thereafter asked the officer conducting the lineup if she had picked out the right person. On cross-examination she stated that she tried to pick out the right man, but had made a mistake.

The majority opinion points out that defendant's alibi witnesses gave conflicting and inconsistent testimony and that defendant's initial statement to investigators was inconsistent with his alibi testimony at trial concerning his activities on the days in question. While defendant's alibi evidence was not unassailable, this evidence was not without probative force.

This was not a racially motivated trial. On the contrary, it was a trial in which two women who were brutally attacked, terrorized and raped sought relief through the criminal justice system. However, the injection of the complained of evidence which the majority agrees was erroneously admitted, invited the jury, whether intentionally or unintentionally, to reach a verdict based upon this contamination.

It seems clear that from all of the probative evidence of record that there was a serious and legitimate question as to identity, and I believe that the totality of the circumstances establishes a reasonable possibility that the complained of evidence induced the jury to substitute emotional and racial prejudices in reaching a verdict and contributed to defendant's conviction. I would therefore vote for a new trial.