1997 ME 158

**STATE of Maine**

v.

**David G. FLEMING.**

Supreme Judicial Court of Maine.

Argued June 12, 1997.

Decided July 21, 1997.

---

504

Andrew Ketterer, Attorney General, Donald W. Macomber, Asst. Atty. Gen. Augusta, Eric E. Wright (orally), Friedman & Babcock, Portland (Mr. Wright was an Assistant Attorney General at the time of trial and was temporarily appointed as such in order appear at oral argument), for State.

William Maselli (orally), Auburn, for defendant.

Before WATHEN, C.J., and ROBERTS, GLASSMAN, CLIFFORD, RUDMAN, and LIPEZ, JJ.

WATHEN, Chief Justice.

[¶ 1]   David G. Fleming appeals from the judgment entered in the Superior Court (Penobscot County, *Mead, J.*) following a jury verdict finding him guilty of intentionally or knowingly causing the death of Lisa Garland in violation of 17–A M.R.S.A. § 201(1)(A)

(1983). The issue on appeal is one of first impression in this state. Defendant contends that deoxyribonucleic acid (DNA) and the "product rule"—a mathematical formula employed in this case in extrapolating the likelihood of a random DNA match [1]—has not been sufficiently accepted in the relevant scientific community to meet the admissibility requirements of M.R.Evid. 702. He also argues, inter alia, that the court erred by admitting testimony relating to prior DNA testing of his blood. Finding no error, we affirm the judgment.

[¶ 2] The record reflects that the jury could have found the following facts: On October 26, 1990, at 8:00 p.m., Fleming left his home in Bucksport and drove to Bangor. He went to the Club Roxy, located a few blocks away from the Green Gables convenience store where Garland worked. Fleming left the Club Roxy after receiving directions to another bar at approximately 11:30 p.m.

[¶ 3] On October 26, Garland was working at the convenience store from late afternoon until closing at 1:00 a.m. She left the store after closing and proceeded to her home located nearby. At 1:30 a.m., Kitty Everett, a close friend, went looking for Garland at her apartment and discovered the apartment door open, a plant knocked over, Garland's open purse on the counter, and an open soda can. Garland was not at the apartment and was not seen alive again.

[¶ 4] Fleming returned to the home he shared with his girlfriend in Bucksport at approximately 3:00 a.m. Fleming did not sleep soundly, awoke at 5:00 a.m. and left in his girlfriend's vehicle. At approximately 6:20 a.m., Fleming, while driving her car, accelerated, veered off the road and crashed head-on into the front of a parked tractor-trailer. Fleming survived the crash, but he was hospitalized for fifteen days.

[¶ 5] On November 30, 1990, an equipment operator found Garland's body lying face down in a gravel pit in Alton. An autopsy revealed that Garland had been raped and died of a skull fracture after being struck by a blunt instrument. The medical examiner was unable to precisely determine the date of Garland's death but testified that there was nothing to indicate that she had not died five weeks before the autopsy. During the autopsy, the medical examiner gathered evidence that included carpet fibers from Garland's socks, a vaginal swab, a vaginal smear, and a whole blood sample. The State Police sent the evidence to the Federal Bureau of Investigation (FBI) for analysis when tests conducted on the vaginal swab and smear revealed the presence of intact sperm cells.

[¶ 6] After the discovery of Garland's body, the police questioned and considered a number of suspects. In July of 1991, the police were alerted to Fleming's possible involvement in Garland's homicide based on an unrelated crime in Cape Neddick.[2] During the investigation into the Cape Neddick crime, the police seized many pieces of white pine from the trunk of Fleming's vehicle, a carpet swatch from the vehicle, and obtained a blood sample from Fleming for DNA analysis.

[¶ 7] A distinctive wood chip had been found among the debris in the body bag used for Garland's body. At the trial, Richard Jagels, a professor at the University of Maine, testified that the wood chip was consistent with the white pine found later in the trunk of Fleming's car and inconsistent with the types of wood otherwise present at the crime scene. Wayne Oakes, a supervisory special agent with the FBI, testified that the fibers taken from Garland's socks matched those from the carpet swatch of Fleming's car.

[¶ 8] Michael Vick, a DNA analyst at the FBI laboratory, testified that restriction

---

1. In general terms, the " 'product rule' ... states that the probability of the joint occurrence of a number of mutually independent events is equal to the product of the individual probabilities that each of the events will occur." *People v. Collins*, 68 Cal.2d 319, 66 Cal.Rptr. 497, 500, 438 P.2d 33, 36 (1968).

2. On July 12, 1991, Fleming raped and attempted to kill a fifteen-year-old girl in Cape Neddick. *See State v. Fleming*, 644 A.2d 1034, 1035 (Me. 1994).

fragment length polymorphism ("RFLP") DNA testing demonstrated that DNA bands from Fleming's whole blood sample matched the DNA bands from the male portion of Lisa Garland's vaginal swab on three of the four probes tested. The fourth probe was declared uninterpretable. Over Fleming's objection, Vick testified that the chances of someone other than Fleming matching the bands from the swab on three probes was 1 in 500,000. Vick testified that the FBI estimates the frequency of DNA patterns by utilizing the product rule. He also testified that, estimating the frequency of DNA patterns pursuant to the "ceiling principle,"[3] the chance of someone other than Fleming matching the bands from the swab was 1 in 35,760.

[¶ 9] Laurence Mueller, an associate professor in population genetics at the University of California–Irvine, testified that the FBI's application of the product rule to Caucasians is wrong. Mueller testified that a better method of determining the frequency of DNA patterns is through the use of the ceiling principle or the counting method. Using the ceiling principle, Mueller testified that the chance of someone other than Fleming matching the bands from the swab was 1 in 140, and using the "counting method," 1 in 1,710.[4]

[¶ 10] Fleming was indicted on March 1, 1993, for intentionally and knowingly causing the death of Lisa Garland in violation of 17–A M.R.S.A. § 201(1)(A) (1983).[5] On August 25, 1993, Fleming filed a motion in limine seeking to prevent the State from admitting the DNA evidence. The court denied Fleming's motion. Fleming now appeals.

## I. Expert Testimony on DNA Match Evidence

[¶ 11] At the motion in limine and at the trial, Fleming failed to challenge the general theory and techniques of DNA profiling.[6] The State now asks us to take judicial notice of the reliability of RFLP DNA testing. We may properly take judicial notice on appeal. M.R.Evid. 201(f). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." M.R.Evid. 201(b).[7]

[¶ 12] After independently reviewing the evidentiary hearing transcripts in this case, the court's findings and conclusions, numerous articles discussing scientists' views on the merits of DNA profiling,[8] and a num-

---

3. The ceiling principle was promulgated by the National Research Council (NRC), Committee on DNA Technology in Forensic Science in 1992. This approach, which has been soundly criticized as being too conservative, attempted to accommodate for statistical fluctuations that result from subpopulations. *See* note 12, *infra*, for a more detailed discussion of the ceiling principle.

4. The counting method estimates the frequency of a particular DNA pattern by counting the number of occurrences of the pattern in a given random population sample. This approach has been criticized as not taking advantage of the full potential of the genetic approach. *See* National Research Council, Committee on DNA Technology in Forensic Science, *DNA Technology in Forensic Science*, 75–76 (1992).

5. 17–A M.R.S.A. § 201 (1983) provides in part:
   1. A person is guilty of murder if:
   A. He intentionally or knowingly causes the death of another human being....

6. For a detailed discussion of the RFLP DNA testing process see Thomas M. Fleming, Annota-

tion, *Admissibility of DNA Identification Evidence*, 84 A.L.R.4th 313 (1991).

7. We have judicially noticed scientific conclusions in the past. *See*, e.g., *State v. Taylor*, 1997 ME 81, ¶ 10, 694 A.2d 907 (reliability of Horizontal Gaze Nystagmus test in making determinations of probable cause for arrest and for purposes of establishing guilt in operating under the influence cases); *Jordan v. Mace*, 144 Me. 351, 69 A.2d 670 (1949) (scientific authorities show that blood tests can accurately disprove paternity); *see generally*, Field & Murray §§ 201.2, 201.3 at 51–53 (4th ed. 1997).

8. One pair of commentators have written that "(t)here is nothing controversial about the theory underlying DNA typing. Indeed, this theory is so well accepted that its accuracy is unlikely even to be raised as an issue in hearings on the admissibility of the new tests." William C. Thompson & Simon Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests*, 75 VA.L.REV. 45, 60 (1989).

ber of state [9] and federal [10] court opinions addressing the admissibility of DNA evidence as a forensic tool in criminal cases, we join the overwhelming number of jurisdictions that have found the overall theory and techniques of DNA profiling [11] scientifically reliable if conducted in accordance with appropriate laboratory standards and controls.

## II. Evidence of Statistical Probability

■ [¶ 13] Fleming contends that the court erred by admitting the statistical component of DNA profiling evidence. His argument focuses on the FBI's use of the product rule. Fleming claims that the NRC report demonstrates that the statistical component of DNA match evidence cannot properly be calculated using the product rule because it is unreliable.[12] We disagree.

■ [¶ 14] The admission of scientific opinion is governed by M.R.Evid. 702:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Pursuant to *State v. Williams*, 388 A.2d 500 (Me.1978), the proponent of expert scientific testimony need only satisfy the trial judge that the evidence is relevant pursuant to Rule 401 and that it will assist the jury in understanding the evidence or determining the existence of a fact in issue. Field &

Murray, *Maine Evidence* § 702.3 at 346 (4th ed. 1997). The determination of whether the proffered expert testimony will be helpful to the jury requires a showing of sufficient reliability. *State v. Boutilier*, 426 A.2d 876, 879 (Me.1981). We review the trial court's evidentiary rulings for clear error and an abuse of discretion. *State v. Taylor*, 1997 ME 81, ¶ 10, 694 A.2d 907.

[¶ 15] Vick's testimony regarding the significance of the DNA match produced by RFLP testing was relevant. Once the jury heard testimony that Fleming's known sample matched the tested portion of the crime scene DNA, it was necessary for the jury to know the degree to which such a match suggested Fleming produced the semen found at the scene. The statistical data admitted reflected the rarity of finding two people who shared the same genetic patterns at several sites on their DNA strands. The evidence on the subject was relevant, therefore, to a determination of Fleming's guilt.

[¶ 16] The expansive literature and case law suggest that the FBI laboratory's frequency estimating process is reliable enough to be admissible scientific evidence. The FBI Laboratory's product rule has been thoroughly tested and the same results can be obtained by different examiners using the same methodology. *See United States v. Bonds*, 12 F.3d 540, 558–59 (6th Cir.1993). The process has been reviewed, debated, and discussed in scholarly articles (both formal peer review and otherwise). *Id.* at 559–60. There is no definitive proof that statistical

---

9. *See Taylor v. State*, 889 P.2d 319, 332 n. 54 (Okla.Crim.App.1995) (citing seventeen cases supporting general acceptance of RFLP test).

10. *See United States v. Martinez*, 3 F.3d 1191, 1197 (8th Cir.1993), *cert. denied*, 510 U.S. 1062, 114 S.Ct. 734, 126 L.Ed.2d 697 (1994) (holding that courts may now take judicial notice of the reliability of the general theory and techniques of DNA profiling); *United States v. Jakobetz*, 955 F.2d 786, 799 (2d Cir.1992), *cert. denied*, 506 U.S. 834, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992) (same).

11. Our admissibility determination does not include the statistical probability component of DNA evidence, that we discuss *infra*.

12. The primary concern of the NRC Committee was that incorrect assumptions were being made about the population's mating tendencies and the

resulting genetic structure of human populations. *See* Committee on DNA Technology in Forensic Science, *supra*, note 4, at 9–14. The Committee's temporary solution to the population substructure problem was the ceiling principle, a conservative formula for computing the statistical component of DNA match evidence that "gave the benefit of every conceivable doubt to the defendant." Eric S. Lander & Bruce Budowle, *DNA Fingerprinting Dispute Laid to Rest*, NATURE, Oct. 27, 1994, at 735–736. Predictably, population geneticists and statisticians soon began criticizing this new method of calculating the statistical significance of a DNA match. Most recently and most notably, however, a member of the disbanded NRC Committee discussed the controversy, concluding that "the DNA fingerprinting wars are over." *Id.* at 735.

results derived by applying genetic principles to DNA database figures have a known or potential risk of error. *Taylor*, 889 P.2d at 336. Finally, it appears that the relevant scientific community has generally accepted the application of the product rule in calculating the statistical component of DNA match evidence. *See* Lander & Budowle, *supra*, at 736.

[¶ 17] Having determined that the statistical portion of the DNA profiling evidence was both relevant and reliable, we must also consider whether the evidence is inadmissible because its probative value was substantially outweighed by the danger of unfair prejudice. M.R.Evid. 403. As we have stated, "prejudice, in this context, means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis...." *State v. Forbes*, 445 A.2d 8, 12 (Me.1982) (quoting *State v. Hurd*, 360 A.2d 525, 527 n. 5 (Me. 1976)).

[¶ 18] The "one in 500,000" statistic was a necessary and probative component of the DNA match because it enabled the jury to appreciate the significance of the match. The jury also heard testimony from Vick as to the statistical evidence applying the ceiling principle and from Fleming's expert that the probability of a match was as low as 1 in 140 pursuant to the ceiling principle. The jury was free to weigh all the evidence, assess the credibility of the witnesses and remain unpersuaded that Fleming committed the crime. *See State v. Kaler*, 1997 ME 219, ¶ 9, 691 A.2d 1226, 1230 (jury's province to resolve inconsistencies and determine the credibility of witnesses). Although the DNA statistics could be considered prejudicial, they are not unfairly so, and in no event did unfair prejudice substantially outweigh the probative value of this evidence. The DNA statistical evidence was relevant and reliable, and the court committed no error in admitting the evidence against Fleming.

### III. Other DNA Test

[¶ 19] Fleming contends that testimony relating to prior DNA testing of his blood was improperly admitted as evidence of a prior bad act. Although he did not object to the admission of this evidence, he argues that, by its admission, the jurors were forced to conclude that he had raped or murdered another person. When the defense fails to object or otherwise preserve an error, we review for obvious error affecting substantial rights. M.R.Crim. 52(b). Obvious error is error that is so highly prejudicial and so taints the proceedings as to virtually deprive the defendant of a fair trial. *State v. Pelletier*, 673 A.2d 1327, 1330 (Me.1996).

[¶ 20] At the trial Fleming vigorously cross-examined all the expert witnesses on their labelling of the evidentiary samples. At a sidebar conference that occurred during the cross examination of Vick, the State warned defense counsel that he was opening the door for the State to dispel any confusion about the mislabelling of the samples. After Fleming's counsel replied, "well, go ahead and do it," the court told the State that it was entitled to clear up opposing counsel's "improper spin" on redirect.

[¶ 21] During the ensuing redirect examination of Vick, the State elicited testimony that a sample of Fleming's blood had been submitted to him "earlier on a prior occasion," that he had already run the sample through the DNA testing procedure, and that he would be able to lay the test results produced on that occasion over the test results produced in this case to establish that there was no inconsistency between Fleming's known sample and the other samples he had received. Defendant offered no objection. The State then requested a sidebar conference and obtained the court's permission to have Vick compare the test results. The State then asked Vick to compare one of Fleming's test results in this case with a comparable test result obtained on a "separate occasion," and he subsequently testified that the band patterns lined up perfectly. The State then offered the other test result into evidence without objection.

[¶ 22] The jury only heard testimony that Vick had obtained Fleming's whole blood

sample on a "separate occasion." Fleming's contention that the jury was then forced to conclude that he had raped or murdered another person is without merit. There was no evidence that a whole blood sample is only obtained by the FBI in rape and murder cases. The jury was free to conclude that the FBI obtained two whole blood samples from Fleming solely as a result of this case. Contrary to Fleming's assertion, the court did not commit obvious error.

[¶ 23] Fleming's remaining arguments, including his challenge to the sufficiency of the evidence, are without merit and require no discussion.

The entry is:

Judgment affirmed.

