2000 ME 107

**STATE of Maine**

v.

**Bobby Llamar KELLY.**

Supreme Judicial Court of Maine.

Argued May 3, 2000.

Decided June 2, 2000.

Michael P. Cantara, District Attorney, Jon C. Gale, Asst. Dist. Atty., David D. Gregory, of counsel (orally), Alfred, for State.

Gregory O. McCullough (orally), Sanford, for defendant.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

CLIFFORD, J.

[¶ 1] Bobby Llamar Kelly appeals from a judgment of conviction of armed robbery (Class A), see 17–A M.R.S.A. § 651 (1983),

entered following a jury trial in the Superior Court (York County, *Brennan, J.*).[1] Kelly contends that the court abused its discretion when it denied Kelly's motion for funds to pay for an expert witness, and that the court erred when it refused to exclude evidence of the victim's identification of Kelly from a photo lineup and in the courtroom and when it refused to exclude statistical DNA evidence. Kelly also contends that the court improperly denied his motion for a new trial. Finding neither. error nor abuse of discretion, we affirm the judgment.

[¶ 2] Early on Sunday morning, January 10, 1999, Kelly, who is African–American, was at a Biddeford 7–11 store with a young woman. Both Kelly and the woman were known by one of the clerks working at the store. Kelly asked for a phone book in order to call a cab. A clerk gave him the book, along with several numbers, one of which was for Alternative Taxi. Kelly and the woman then left.

[¶ 3] Shortly thereafter, and near the 7–11, an African–American man described as wearing a wool cap, a green mask covering his mouth and nose, and a dark jacket and jeans flagged down a driver from Alternative Taxi. The man got in the cab and rode to Saco, pleasantly conversing with the driver as they went. Eventually, the man apparently asked to be driven back to Biddeford, and directed the cab driver to drive around several streets, ostensibly so that he could find a friend's house. Finally, the man told the driver to stop, and paid the driver.

[¶ 4] The man then declared that he "would take all of it," and when the driver turned around, he saw what he at first took for the end of a silver-colored, toy gun in the man's hands. Soon, however, the driver realized it was a real gun. The driver then gave back the money he had just received from the man as a fare, but

---

1. Kelly was sentenced to 18 years, all but 8 suspended, and 6 years probation.

no more.[2] The man then reached over, took the car keys, and left on foot.

[¶ 5] The driver radioed his dispatcher for assistance, and then exited the vehicle to pursue the man. The man took off his mask, and the driver testified that he got a good look at the man's full face for the first time. Apparently noticing that he was being pursued, the man dropped the mask as he fled. The driver returned to his car, and eventually the police arrived and collected the mask.

[¶ 6] Kelly's friend, Ronald Bean, who lived near where the robbery occurred, was awakened by Kelly at about 6:00 A.M. Bean testified that Kelly appeared nervous, and that Kelly asked Bean to hide a silver pistol that Kelly pulled from his backpack. Bean had seen this weapon before—he had been the intermediary between two friends in its sale just the previous day. Kelly wanted to stay, but Bean insisted he leave.

[¶ 7] Another robbery had occurred a few hours before the robbery in this case. According to a detective investigating that earlier crime, the victim[3] had known his robber by the name "Lamar." Based on this name, the detective prepared a photo array that contained Kelly's picture along with pictures of five others who looked as similar to Kelly as the detective was able to find. The victim of the first robbery picked out Kelly from the array. On the basis of this identification, Kelly was arrested on January 11.

[¶ 8] The next day, the detective presented the same photo array to the victim in this case, the cab driver.[4] The detective asked the driver whether he had heard about an arrest on a similar crime, which had been on the local news, and the driver indicated he had not. The detective also told the driver that the array might or might not include the person who had robbed him. The driver picked out Kelly as his robber, "spott[ing] him right away." The driver testified that he was sure of his identification because of "[h]is eyes, just the way his eyes were, wide-open. I saw the eyes so clear. All of the other pictures you looked at, the eyes aren't the same thing, not like that." The driver testified that the detective then told him that he had picked out a police officer as his robber, but the driver did not change his choice. According to the driver, only then was he told he had picked out the man the police had in custody for the other robbery.

[¶ 9] Kelly was indicted on two counts of robbery with a dangerous weapon.[5] See 17-A M.R.S.A. § 651. In denying Kelly's motion to suppress evidence, the court indicated it was "satisfied that under all of the circumstances there is nothing in this lineup which is necessarily suggestive."

[¶ 10] At trial, defense counsel wished to present the cab driver with a photo array that showed a number of sets of eyes and ask him to identify the "eyes" who had robbed him. Counsel asked that the driver not be allowed to see Kelly (and his eyes) prior to this line of questioning. In order to facilitate this, the court and the attorneys agreed that the driver would be asked by the prosecutor to identify the robber as early as possible, and then Kelly would be excused from the courtroom for the duration of the driver's testimony. The prosecutor asked the driver if he saw "in this courtroom anywhere, do you see the defendant, the person who robbed you

---

2. The driver testified that it was his practice to keep the bulk of the money he carried separately, apparently to help foil robbery attempts.

3. Defense counsel's theory of the case seems to have been that this person, who was also African–American, had in fact been the man who robbed the cab driver.

4. The cab driver was not initially presented with a photo array because the detective thought the driver had not "seen the robber's face well enough."

5. One count, relating to the robbery of the other man, was dismissed by the State just prior to trial.

that morning?"[6] The driver identified Kelly, who, counsel noted in closing argument, was the only African–American male present. On cross-examination, the driver was unable to identify his robber from the array of eyes presented by defense counsel.

[¶ 11] Prior to trial, Kelly moved for funds for an expert witness who would testify regarding certain identification issues, contending that there was a sufficient scientific basis for the jury to hear testimony regarding the reliability of so-called "cross-racial identifications"; i.e., identifications of persons of one race by persons of another, and regarding the reliability of identifications of which the witness professes "certainty." The court (*Fritzsche, J.*), quoting from a decision of the New Jersey Supreme Court, denied the motion on the basis that, because there is a widely-held belief that cross-racial identifications were generally of lesser reliability, expert testimony would not be helpful. *See State v. Cromedy*, 158 N.J. 112, 727 A.2d 457, 467–68 (1999).[7] At trial, the court instructed the jury that it could consider whether the respective races of the victim and the defendant had any bearing on the reliability of the driver's identification.

[¶ 12] DNA analysis on the mask worn by the robber and left at the scene revealed DNA from at least three persons. Kelly's DNA was consistent with one of the DNA samples found on the mask, and the State's DNA expert was allowed to testify, over the objection of Kelly, that the DNA of only one person in 20,000 would be consistent with that sample.

[¶ 13] After retiring to deliberate, the jury requested that the testimony regarding the DNA evidence be read back. This request was granted, and following brief additional deliberations, the jury found Kelly guilty. Kelly's motion for a new

trial on the ground that the statistical DNA evidence had confused the jury and that the State had withheld exculpatory evidence was denied, and Kelly filed this appeal.

## I.

[¶ 14] Kelly contends the trial court abused its discretion when it denied his motion for funds for an expert witness who was to have testified regarding the reliability of cross-racial identifications.

[¶ 15] Rule 702 of the Maine Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

M.R. Evid. 702. The trial court "is vested with broad discretion" with regard to the admission of such expert testimony. *State v. Rich*, 549 A.2d 742, 743 (Me.1988). Moreover, a defendant is not entitled to funds for an expert unless the testimony the expert is to provide is found to be admissible. *See id.* (citing *State v. Gordius*, 544 A.2d 309, 310–11 (Me.1988)).

[¶ 16] Although we have never addressed the issue of cross-racial identification, we have repeatedly upheld the exclusion of expert testimony regarding eyewitness reliability as within the court's discretion. *See State v. Chapman*, 645 A.2d 1, 2 (Me.1994); *Rich*, 549 A.2d at 743; *State v. Fernald*, 397 A.2d 194, 197 (Me.1979). We have found no cases, and Kelly has cited none, holding that it was an abuse of the trial court's discretion to

---

6. Kelly suggests this was an improper statement. The State characterizes it as a "slip of the tongue" corrected by the prosecutor. No objection was made at trial.

7. In *Cromedy*, the New Jersey court held that, although not entitled to expert testimony, the defendant was entitled to a jury instruction on this issue. *See Cromedy*, 727 A.2d at 467–68.

exclude such testimony or to deny funds to produce such testimony.[8]

[¶ 17] In denying the motion for funds, the court found that the testimony would not be helpful to the jury. Moreover, the trial court did instruct the jury regarding cross-racial identification consistent with *State v. Cromedy*, and the parties argued the issue before the jury. The court's conclusion that the expert's testimony would not be helpful to the jury is not clearly erroneous, and its decision to deny funds for that reason was within its broad discretion.

## II.

### A.

[¶ 18] Kelly contends the evidence that the victim identified Kelly from the photo lineup as the perpetrator of the robbery should not have been admitted because the identification was made on the driver's extremely limited view of the robber and because of the allegedly suggestive procedure used by the detective.

[¶ 19] We have held that a two-part test must be applied to determine whether an out-of-court identification should be admitted in evidence. *See State v. True*, 464 A.2d 946, 950 (Me.1983) (citing *Neil v. Biggers*, 409 U.S. 188, 198–99, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972)). Initially the defendant must prove, by a preponderance of the evidence, that the identification procedure was suggestive; i.e., that it "tended to 'increase the likelihood of misidentifica-

tion.'" *True*, 464 A.2d at 950 (quoting *Biggers*, 409 U.S. at 198, 93 S.Ct. 375). If defendant meets that burden and the court finds the procedure was suggestive, the State then bears the burden of proving, by clear and convincing evidence, that in the totality of the circumstances the identification, although made under a suggestive procedure, is nevertheless reliable. *See True*, 464 A.2d at 950 (quoting *Biggers*, 409 U.S. at 199, 93 S.Ct. 375).

[¶ 20] Here, the court found that the defendant had failed to meet his initial burden of showing that the procedure was suggestive, and accordingly did not address whether, if suggestive, it was nevertheless reliable. The driver and the detective each testified that the driver was presented an array of photographs without any improper, suggestive comments or other behavior by the detective. Accordingly, the court's conclusion that the photo identification was not unduly suggestive is not clearly erroneous.

### B.

[¶ 21] Kelly neither objected nor requested a curative instruction when, at trial, the prosecutor asked the driver if he saw "in this courtroom anywhere, do you see the defendant, the person who robbed you that morning?" When the defendant fails to make a timely objection, we review for obvious error affecting substantial rights. *See State v. Miller*, 1999 ME 182, ¶ 6, 741 A.2d 448, 450. Here, although the question by the prosecutor implying that the witness should identify the defendant

---

8. *See United States v. Smith*, 122 F.3d 1355, 1359 (11th Cir.1997) (holding it was not an abuse of discretion to exclude testimony); *United States v. Serna*, 799 F.2d 842, 849 (2d Cir.1986) (same), *abrogated on other grounds*, *United States v. DiNapoli*, 8 F.3d 909, 914 n. 5 (2d Cir.1993); *State v. Garner*, 523 S.E.2d 689, 695 (N.C.1999) (holding it was not an abuse of discretion to deny funds); *State v. Miles*, 585 N.W.2d 368, 371–72 (Minn.1998) (holding it was not an abuse of discretion to exclude testimony); *McMullen v. State*, 714 So.2d 368, 373 (Fla.1998) (same); *State v. Gardiner*, 636 A.2d 710, 714 (R.I.1994) (same); *State v. Cotton*, 99 N.C.App. 615, 394 S.E.2d 456, 460 (1990) (same); *Dewberry v. State*, 743 S.W.2d 260, 268 (Tex.Ct.App.1987) (holding not an abuse of discretion to deny funds), *rev'd on other grounds*, 776 S.W.2d 589 (Tex.Crim.App.1989); *see also State v. Gaines*, 260 Kan. 752, 926 P.2d 641, 649 (1996) (expert testimony regarding eyewitness identification is never admissible). *But see People v. McDonald*, 37 Cal.3d 351, 208 Cal. Rptr. 236, 690 P.2d 709, 726 (1984) (holding court abused its discretion when it excluded psychologist's testimony regarding host of identification issues, among which was cross-racial identification).

as the guilty party is improper, the impropriety was neither "so highly prejudicial [nor did it] so taint[ ] the proceedings as virtually to deprive the defendant of a fair trial." *State v. Pelletier*, 673 A.2d 1327, 1330 (Me.1996); *compare State v. Tripp*, 634 A.2d 1318, 1320 (Me.1994) (vacating for obvious error where prosecutor elicited a statement that another witness had lied on the stand, in a case where that witness's credibility was a central issue in the case).

### III.

[¶ 22] Kelly contends the court abused its discretion when it admitted the DNA 1-in-20,000 statistic because it was irrelevant and confused the jury. The Court reviews "the trial court's evidentiary rulings for clear error and an abuse of discretion." *State v. Fleming*, 1997 ME 158, ¶ 14, 698 A.2d 503, 507 (citing *State v. Taylor*, 1997 ME 81, ¶ 10, 694 A.2d 907, 910).

[¶ 23] In *Fleming*, we held that, once DNA evidence is heard by the jury, testimony regarding "the degree to which ... a match suggested" the presence of the defendant became relevant. *See Fleming*, 1997 ME 158, ¶ 15, 698 A.2d at 507. Here, Kelly withdrew his motion with respect to the DNA expert's testimony in general, conceding that this testimony was relevant and admissible. Further statistical testimony suggesting that Kelly may have used the mask became relevant as well.

[¶ 24] The remaining question is whether, though relevant, the evidence should nevertheless be excluded as unduly prejudicial or as likely to mislead the jury. *See* M.R. Evid. 403. Kelly contends that this case is similar to *State v. Eaton*, 669

A.2d 146 (Me.1995), in which the Court held that the trial court had abused its discretion when it admitted expert testimony that hair found at the crime scene were "not dissimilar" to the victim's hair.[9] *Id.* at 149. The Court found that the statement could lead a jury "to conclude that the hairs found in the truck were the victim's, when in fact the testimony technically meant only that the hair match was inconclusive." *Id.* Here, the testimony at issue is of a different character. The statement that only one in 20,000 persons have DNA consistent with that found in the mask is not a vague proposition, as is that two hair samples are "not dissimilar." Although Kelly contends that the prosecutor misrepresented the meaning of this evidence in his closing argument,[10] Kelly's remedy was to object before the trial court that the prosecutor had misstated the facts. *Cf. State v. Weeks*, 634 A.2d 1275, 1276 & n.1 (Me.1993). Kelly made no such objection. The trial court's decision to admit the statistical evidence was within its broad discretion.

### IV.

[¶ 25] Finally, Kelly contends the court erred when it denied his motion for a new trial. Kelly based the motion in part on what he terms as the State's prejudicial failure to disclose Bean's knowledge that the defendant had worn the mask prior to the robbery. As the State points out, however, the court, in denying the motion for a new trial, relied on the fact that Kelly's counsel was fully aware that defendant had worn the mask on at least one occasion prior to the time of the robbery.

On a motion for a new trial based on newly discovered evidence, the defen-

---

9. We ultimately upheld the guilty verdict, however, concluding that even though the expert evidence should have been excluded, there was other evidence sufficient to sustain the defendant's guilt beyond a reasonable doubt. *See id.* at 149.

10. It is not clear that the prosecutor did in fact misrepresent the thrust of the statistical evidence. In his closing argument, the prose-

cutor stated that "the mask left at the scene had evidence that Bobby Llamar Kelly had worn it," and that "the mask ... has evidence of Bobby Llamar Kelly's DNA." These statements do not go so far as to claim that Kelly's DNA was actually on the mask. Instead, these statements can be understood to refer only to the fact that the DNA found in the mask did not rule Kelly out as the robber.

dant must show, by convincing evidence, the following: "(1) That the evidence is such as will probably change the result if a new trial is granted; (2) that it has been discovered since the trial; (3) that it could not have been discovered before trial by the exercise of due diligence; (4) that it is material to the issue; and (5) that it is not merely cumulative or impeaching, unless it is clear that such impeachment would have resulted in a different verdict."

*State v. Marshall,* 491 A.2d 554, 559 (Me. 1985) (quoting *State v. Lord,* 458 A.2d 432, 433 (Me.1983)). When the "newly discovered" evidence is "merely corroborative of evidence which [the defendant] could himself have presented, and which he elected not to disclose, to the jury," the defendant is estopped "from seeking a new trial on the ground of newly discovered evidence." *State v. Harding,* 408 A.2d 1003, 1005 (Me. 1979).

 [¶ 26] Here, Kelly's counsel admitted that he knew Kelly had previously worn the mask.[11] Moreover, Kelly presumably knew that Bean, and perhaps others, had seen him wearing the mask, and Kelly certainly knew that he had worn it himself. Accordingly, the "newly discovered evidence" merely corroborates that which Kelly knowingly elected not to disclose to the jury. Kelly is thus estopped from using that ground as a basis for seeking a new trial, and the court's denial of his motion was well within its discretion.

The entry is:

Judgment affirmed.

---

11. For this reason, we find no error under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In that case, the Supreme Court made it clear that the rule requiring disclosure of exculpatory evidence by the prosecutor is based on the principle of "avoid[ing] ... an unfair trial to the accused." *Id.* at 87, 83 S.Ct. 1194. When the defendant is aware, before trial, of the exculpatory evidence alleged to have been withheld, he cannot claim that there has been an unfair trial in violation of due process. *See United States v. DeLeo,* 422 F.2d 487, 499 (1st Cir.1970), *cert. denied,* 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970).