STATE OF NORTH CAROLINA v. BENJAMIN ALEXANDER COLE

No. COA00-1311

(Filed 18 December 2001)

**1. Witnesses— leading questions—no abuse of discretion**

The trial court did not improperly permit the State to ask leading questions in a first-degree murder prosecution where the questions at issue were not leading or were permissible to develop a witness's testimony.

**2. Criminal Law— prosecutor's argument—defendant as drug dealer—factual basis**

The trial court did not abuse its discretion in a first-degree murder prosecution by denying defendant's objections to portions of the State's closing argument as not being based on facts in evidence. The State specifically outlined the evidence which formed the basis of the inference that defendant was a drug dealer and defendant invited the issue by offering an alibi and suggesting that the victim's "drug-related killing" could have been committed by a "disgruntled client." Moreover, the impropriety of the statements was not so extreme as to prejudice the jury.

**3. Identification of Defendants— eyewitness testimony—expert witness rejected**

The trial court did not err in a first-degree murder prosecution by not allowing defendant's proffered expert testimony on identification testimony where the court found that the witness was in no better position than the jury to determine the weight to be given the identifications in this case, that the witness's testimony would not provide any appreciable assistance to the jury in evaluating the identifications, and that his testimony was outweighed by the risk of confusing the jury.

**4. Criminal Law— instructions—reasonable doubt**

The trial court did not err in a first-degree murder prosecution in its instructions as to the meaning of "reasonable doubt" where the State in its argument quoted from two Supreme Court decisions, the trial court originally used the Pattern Jury Instructions definition, the jury first requested a copy of the language to which the State had referred, then asked the court to reconcile the language from the two opinions, and the court responded by reading the language from the two opinions and

instructing the jury that it was to interpret each in its own context. There is nothing in the record to indicate that the jury was confused after the court's further instructions and the two Supreme Court cases accurately defined reasonable doubt.

**5. Identification of Defendants— eyewitness testimony—percentages of certainty**

The trial court did not err in a first-degree murder prosecution by allowing the State to ask a witness to give percentages of certainty to the words "sure" and "pretty sure" in her identification testimony.

**6. Identification of Defendants— photographic—computer generated display**

The trial court did not err in a first-degree murder prosecution by admitting a witness's pre-trial and in-court identifications of defendant where the display contained 19 thumbnail photographs generated from a computerized system which matched descriptions given by witnesses and the detective merely asked if anyone looked like one of the perpetrators but did not make any comments or suggestions.

Appeal by defendant from judgment entered 20 December 1999 by Judge L. Todd Burke in Guilford County Superior Court. Heard in the Court of Appeals 11 October 2001.

*Attorney General Roy Cooper, by Assistant Attorney General Buren R. Shields, III, for the State.*

*Leonard Law Firm, by Robert K. Leonard, for defendant-appellant.*

WALKER, Judge.

Defendant appeals his conviction for first degree murder under the felony murder rule. The State's evidence presented at trial tends to show the following: On the evening of 22 May 1998, Tonya Luther (Luther), Alesia Clapp (Clapp), and Tina Clapp were visiting with Calvin Jenkins (Jenkins) in his Greensboro apartment. At approximately 9:10 p.m., Luther decided to leave and check on her nearby apartment. As she was walking out, there was a knock at the front door. Jenkins opened the door and two black males entered. One was noticeably shorter than the other. Luther said "Hi" to the men as she walked out. The men then spoke briefly with Jenkins and left.

STATE v. COLE

[147 N.C. App. 637 (2001)]

A short time later, Luther returned to Jenkins' apartment and saw the same two men standing in the parking lot. After about ten minutes, there was another knock at the front door. Jenkins again answered and the two men entered. The three women were talking in the kitchen near the apartment's entrance. Luther and Clapp heard one of the men say "Give me some money" and observed Jenkins raise his hands. They next heard a gun shot and saw Jenkins fall to the floor. The shorter of the two men approached the women and asked, "Where's the money at?" The taller man began to search the kitchen. After he found "three or four bags of marijuana," the two men left.

When the police arrived at the apartment, Luther and Clapp provided them with a description of the two men. Four days later, Luther and Clapp went to the Greensboro Police Department where they gave further descriptions. The police then entered a composite description of each man into a computerized photographic database known as the "Spillman system." This system matched the descriptions to photographs maintained in a computer database. It then displayed approximately nineteen photographs at one time on a seventeen-inch computer screen. At this time, Luther and Clapp viewed more than one thousand photographs but did not see one which depicted either of the two men.

The next day, Luther returned to the police department and continued viewing photograph displays. After some time, she selected a photograph which she identified as depicting the shorter of the two men. She continued to view several displays but did not see a photograph of the second man. Later that evening, a Greensboro detective went to Clapp's place of work and showed her the display from which Luther had made her identification. Clapp selected the same photograph as Luther. Defendant was the individual shown in the photograph.

At trial, both Luther and Clapp identified defendant as being the shorter man in Jenkins' apartment on the evening of 22 May 1998. Forensic evidence also showed that Jenkins died of a single gunshot wound to the chest. From the apartment, crime scene technicians recovered 175.9 grams of marijuana, a scale which is similar to those used in weighing marijuana, approximately one thousand dollars in cash, and several boxes of pistol cartridges.

Defendant presented evidence which tended to show that he had been in Dayton, Ohio, for three to four months prior to June 1998. A

recording engineer also testified that he billed defendant for the use of a studio in Dayton for the same date that Jenkins was killed.

**[1]** With his first assignment of error, defendant contends the trial court erred by permitting the State to ask leading questions of its witnesses and to argue facts during closing argument which were not in evidence.

Our appellate courts have consistently held that control over the course and conduct of a trial is the responsibility of the trial court and will not be disturbed absent an abuse of discretion. *State v. Covington*, 290 N.C. 313, 334-35, 226 S.E.2d 629, 644 (1976); *State v. Davis*, 77 N.C. App. 68, 74, 334 S.E.2d 509, 513 (1985); *State v. Dickens*, 346 N.C. 26, 44, 484 S.E.2d 553, 563 (1997)("[r]ulings concerning the admissibility of leading questions are in the sound discretion of the trial court and should not be disturbed absent an abuse of that discretion"); *State v. Johnson*, 298 N.C. 355, 368, 259 S.E.2d 752, 761 (1979)("control of the arguments of counsel must be left largely to the discretion of the trial judge"). An abuse of discretion occurs only where the trial court's ruling is "so arbitrary that it could not have been the result of a reasoned decision." *State v. Hayes*, 314 N.C. 460, 471, 334 S.E.2d 741, 747 (1985). Even in situations where the trial court does err, a defendant is not entitled to a new trial unless such error is material and prejudicial. *State v. Alston*, 307 N.C. 321, 339, 298 S.E.2d 631, 644 (1983).

Defendant first asserts that he is entitled to a new trial by arguing that the trial court abused its discretion in allowing the State to ask leading questions of its witnesses. Specifically, defendant identifies thirteen questions asked of six different witnesses which he contends were leading.

After carefully reviewing each of these questions, we agree with the trial court's conclusion that they were either not leading questions or were permissible to develop a witness' testimony. *State v. Smith*, 135 N.C. App. 649, 655, 522 S.E.2d 321, 326 (1999), *disc. review denied*, 351 N.C. 367, 543 S.E.2d 143 (2000). Defendant has also failed to demonstrate how the trial court's allowing these questions resulted in prejudicial error. *Dickens*, 346 N.C. at 44, 484 S.E.2d at 563.

**[2]** Defendant next asserts that he is entitled to a new trial based on the State's presenting to the jury facts which were not in evidence.

During his closing argument, defendant argued that Jenkins' death was a "drug-related killing." He maintained that Jenkins was a

drug dealer, that people were constantly in and out of his apartment, and that he was likely killed by a disgruntled client. Defendant also argued that he could not possibly have killed Jenkins because he was in Dayton, Ohio, on the day of the shooting.

In its argument and in response to these assertions, the State recounted for the jury the testimony of witnesses who stated that defendant smoked marijuana, was frequently seen coming and going from Jenkins' apartment, and maintained a high life style without any known job or visible source of income. The State also noted there was testimony that defendant's father had flown into town every couple of weeks and stayed in the exact same motel. After outlining this testimony, the State asked a number of rhetorical questions to which defendant made two objections: "[E]ver wonder what his [father's] business might be? . . . Might common sense tell you that he might be a Jamaican drug dealer? . . . Might you infer that his son is involved in his father's business? . . . I mean, remember the demand? 'Where's the money at?' You think that might sound Jamaican?" The State concluded by suggesting to the jury that it might infer from the evidence that defendant was selling drugs to Jenkins and that Jenkins' killing had "all the earmarks of a drug killing."

Defendant contends the trial court erred by failing to sustain his objections to this portion of the State's argument. However, after considering the State's comments within the context in which they were made, we conclude the trial court did not abuse its discretion in failing to sustain defendant's objections. *See State v. Rouse*, 339 N.C. 59, 91, 451 S.E.2d 543, 560, *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1994)("Prosecutorial statements are not placed in an isolated vacuum on appeal. Fair consideration must be given to the context in which the remarks were made and to the overall factual circumstances to which they refer"). The State specifically outlined the evidence which formed the basis of the inferences it argued. Moreover, defendant invited this line of discussion by offering an alibi and first suggesting to the jury in his own closing argument that Jenkins' "drug-related killing" could have been committed by a "disgruntled client." *See State v. Larrimore*, 340 N.C. 119, 165, 456 S.E.2d 789, 814 (1995) (noting prosecutor is allowed to respond to arguments made by defense counsel).

Further, even assuming *arguendo* that these statements were improper, their impropriety was not so extreme as to prejudice the jury in its deliberations. *State v. Ingle*, 336 N.C. 617, 650-51, 445

S.E.2d 880, 898 (1994), *cert. denied*, 514 U.S. 1020, 131 L. Ed. 2d 222 (1995) (holding a defendant is not entitled to a new trial because of an improper prosecutorial comment, properly objected to, unless the comment amounted to prejudicial error). This assignment of error is overruled.

[3] In his second assignment of error, defendant asserts the trial court erred by not allowing the testimony of his expert witness. During his presentation of evidence, defendant sought to offer the testimony of Dr. Reed Hunt, a professor of psychology at the University of North Carolina at Greensboro. During *voir dire*, Dr. Hunt testified that he was not a licensed or clinical psychologist. He further testified that he had attempted to testify in State court on three previous occasions but had been permitted to testify only once. On that occasion, the circumstances did not involve a photographic lineup but rather an in-court identification. Dr. Hunt stated there are several factors which affect an eyewitness identification and that witnesses often state they are sure of their identification when, in fact, they are wrong. He added that when the crime involves a weapon, the accuracy of the identification is "considerably lower." The trial court denied defendant's motion to admit Dr. Hunt's testimony finding that: (1) he was in no better position than the jury to determine the weight to be given to the identifications of Luther and Clapp; (2) his testimony would not provide any appreciable assistance to the jury in evaluating the identifications; and (3) his testimony, even if probative, was outweighed by the risk it carried of confusing the jury.

Our Supreme Court has held, "It is undisputed that expert testimony is properly admissible when such testimony can assist the jury to draw certain inferences from facts because the expert is better qualified." *State v. Locklear*, 349 N.C. 118, 147, 505 S.E.2d 277, 294 (1998), *cert. denied*, 526 U.S. 1075, 143 L. Ed. 2d 559 (1999) (*quoting State v. Bullard*, 312 N.C. 129, 139, 322 S.E.2d 370, 376 (1984)); N.C. Gen. Stat. § 8C-1, Rule 702(a) (1999). This Court has previously addressed the issue of the admissibility of expert testimony on eyewitness identifications and has held that "the admission of expert testimony regarding memory factors is within the trial court's discretion, and the appellate court will not intervene where the trial court properly appraises probative and prejudicial value of the evidence under Rule 403 and the Rules of Evidence." *State v. Cotton*, 99 N.C. App. 615, 621, 394 S.E.2d 456, 459 (1990), *affirmed*, 329 N.C. 764, 407 S.E.2d 514 (1991) (*citing State v. Knox*, 78 N.C. App. 493, 495-96, 337 S.E.2d 154, 156 (1985)). Our review of the trial court's findings reveals

that it considered Dr. Hunt's testimony and found that any probative value was outweighed by the risk of confusing the jury. We conclude the trial court did not abuse its discretion in not allowing Dr. Hunt's proffered testimony.

**[4]** With his third assignment of error, defendant contends the trial court erred in its instructions to the jury as to the meaning it should give to "reasonable doubt." During its closing argument, the State quoted language from our Supreme Court's decisions in *State v. Adams*, 335 N.C. 401, 439 S.E.2d 760 (1994) and *State v. Bishop*, 346 N.C. 365, 488 S.E.2d 769 (1997), which offered explanations as to how a jury was to interpret "reasonable doubt." Here, following closing arguments, the trial court, in its instructions to the jury, defined reasonable doubt using the North Carolina Pattern Jury Instruction (Criminal) 101.10. During its deliberations, the jury requested a copy of the language to which the State had referred in its closing argument. Over defendant's objection, the trial court provided the jury with a copy of the language used in both *Adams* and *Bishop*. After further deliberations, the jury asked the trial court to reconcile the language from *Adams* "nor is it proof beyond a shadow of a doubt nor proof beyond all doubts. . . ." 335 N.C. at 420, 439 S.E.2d at 770, with the language from *Bishop* "fully satisfies or entirely convinces you. . . ." 346 N.C. at 399, 488 S.E.2d at 787. The trial court responded by reading the pertinent language from both *Adams* and *Bishop* and instructing the jury that it was to interpret each within its own context.

Defendant maintains that the jury apparently believed that the language of *Adams* and *Bishop* could not be reconciled, therefore demonstrating a reasonable likelihood that it applied a standard of proof less than "beyond a reasonable doubt." However, there is nothing in the record to indicate that the jury was confused about the standard of proof after the trial court's further instructions. Both *Adams* and *Bishop* accurately define "proof beyond a reasonable doubt." Thus, we conclude the trial court committed no error in its instructions to the jury on the definition of reasonable doubt.

**[5]** In his fourth assignment of error, defendant argues the trial court erred in allowing the State to ask Clapp questions which defendant maintains were beyond her personal knowledge.

Defendant identifies three specific questions which were asked of Clapp concerning the certainty of her pre-trial and in-court identifications. The first question occurred after Clapp had described

her opportunity to view the defendant on the evening of 22 May 1998:

> Q: . . . what kind of look were you able to get at the person's facial features during that . . . approximate three minute period?
>
> A: A glance.
>
> Q: Do you feel personally that you got a good look at the person should you see them [sic] again?

The trial court overruled defendant's objection.

> A: Yes.

The second question occurred following Clapp's testimony concerning her identification of defendant from the photograph display:

> Q: At the time you picked out the photograph, Ms. Clapp, how certain or how sure were you that the person you picked out . . . was what you're describing as [the defendant]?
>
> A: Pretty sure.
>
> Q: All right. If you had to put pretty sure in some kind of a percent—could you do that?

The trial court overruled defendant's objection.

> Q: So we know what you mean by pretty sure. I mean are we talking—
>
> A: Sure.
>
> Q: —70 percent, 90 percent, 95 percent? What are we talking?
>
> A: 95 percent.

The final question occurred after defendant cross-examined Clapp concerning her in-court identification:

> Q: Now, what is your degree of certainty when you pointed to the defendant seated over there at the table . . . as to him being . . . the person you saw [the evening of 22 May 1998]?
>
> A: Pretty sure.
>
> Q: Is that equal to more than sure?

The trial court overruled defendant's objection.

> A: Yes.

Defendant asserts that the trial court should have sustained his objections and prevented Clapp from providing answers and percentages with respect to her degree of certainty for the reason that such a precise calculation was beyond her personal knowledge.

Under our rules of evidence, a witness "may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." N.C. Gen. Stat. § 8C-1, Rule 602 (1999). The purpose of Rule 602 is to prevent a witness from testifying to a fact of which he has no direct personal knowledge. *See* N.C. Gen. Stat. § 8C-1, Rule 602 (Commentary) (1999). "[P]ersonal knowledge is not an absolute but may consist of what the witness thinks he knows from personal perception." *Id.* Here, each of the State's questions were designed to ascertain from Clapp the degree of certainty she attached to the words "sure" and "pretty sure" in relation to what she observed about defendant in Jenkins' apartment on the evening of 22 May 1998. Such information was within her personal knowledge. Therefore, we overrule defendant's assignment of error.

**[6]** Finally, defendant contends the trial court erred in admitting Clapp's pre-trial and in-court identifications of defendant, arguing that each was "impermissibly suggestive."

With regard to a pre-trial identification, such evidence must be excluded where the "facts reveal a pretrial identification procedure [which is] so impermissibly suggestive that there is a very substantial likelihood of irreparable misidentification." *State v. Harris*, 308 N.C. 159, 162, 301 S.E.2d 91, 94 (1983). Accordingly, in the context of a photograph display, a positive identification must be suppressed where the display is both: "(1) impermissibly suggestive, and (2) so suggestive that irreparable misidentification is likely." *State v. Roberts*, 135 N.C. App. 690, 693, 522 S.E.2d 130, 132 (1999) (*citing State v. Pigott*, 320 N.C. 96, 99, 357 S.E.2d 631, 633 (1987)).

Defendant argues that the photograph display from which Clapp identified defendant was impermissibly suggestive in that "[t]here is no evidence that any of the other photos even came close to matching the original description" which Clapp gave to police. The evidence shows that the display contained nineteen thumbnail-sized photographs. These photographs were generated from a computerized system which matched photographs similar to the descriptions Clapp and Luther provided to police. The evidence also shows that the detective did not make any comments or suggestions to Clapp when

he showed her the display but merely asked her if anyone looked like one of the perpetrators. *See generally State v. Goodson*, 101 N.C. App. 665, 670-71, 401 S.E.2d 118, 122 (1991). Therefore, the trial court properly concluded that Clapp's pre-trial identification was not impermissibly suggestive and we find no error with its admission.

Defendant also argues that the trial court should not have permitted Clapp to make an in-court identification because it was tainted by the impermissibly suggestive pre-trial identification. However, having found no merit to defendant's claim concerning Clapp's pre-trial identification, we likewise conclude that the trial court did not err in permitting her to make an in-court identification. *See Roberts*, 135 N.C. App. at 694-95, 522 S.E.2d at 133 (where pre-trial identification is not impermissibly suggestive, a subsequent in-court identification cannot be considered "fruit of the poisonous tree").

In sum, we find defendant received a trial free of prejudicial error.

No error.

Judges MARTIN and TYSON concur.