STATE v. McLEAN

[183 N.C. App. 429 (2007)]

———

STATE OF NORTH CAROLINA v. DWIGHT McLEAN

No. COA06-952

(Filed 5 June 2007)

## 1. Evidence— exclusion of expert testimony—identification procedures

The trial court did not abuse its discretion in a first-degree murder and felonious conspiracy to commit robbery with a firearm case by barring the expert testimony of Dr. Cutler regarding the identification procedures used, because: (1) Dr. Cutler did not interview the witnesses in this case, he did not observe their trial testimony, and he did not visit the crime scene; and (2) the probative value of the testimony, considered in the light most favorable to defendant, was marginally weak and the evidence would

confuse the jury, unnecessarily delay the proceeding, and would not be of significant assistance to the jury.

## 2. Evidence— privileged communications—statements made by codefendants to their attorneys

The trial court did not err in a first-degree murder and felonious conspiracy to commit robbery with a firearm case by denying defendant's motion to compel disclosure of the statements made by his codefendants to their respective attorneys because, although defendant relies on our Supreme Court's opinions in *Miller I*, 357 N.C. 316 (2003), and *Miller II*, 358 N.C. 364 (2004), the language used demonstrated that the Court intended to limit the scope of its opinions to situations where the client is deceased.

Appeal by Defendant from judgments entered 18 October 2004 by Judge Henry W. Hight, Jr. in Superior Court, Wake County. Heard in the Court of Appeals 8 March 2007.

*Attorney General Roy Cooper, by Assistant Attorney General Steven F. Bryant, for the State.*

*Glover & Petersen, P.A., by Ann B. Petersen, for Defendant-Appellant.*

McGEE, Judge.

Dwight McLean (Defendant) was convicted of first-degree murder, attempted robbery with a firearm, three counts of robbery with a firearm, and feloniously conspiring to commit robbery with a firearm. Defendant was sentenced to life imprisonment without parole on the first-degree murder charge and a minimum of twenty-five months to a maximum of thirty months in prison on the conspiracy charge. The trial court arrested judgment on the three counts of robbery with a firearm and the charge of attempted robbery with a firearm. Defendant appeals.

An armed robbery of night shift employees of the Sewer Maintenance Department of the Raleigh Public Utilities Department (the sewer department) occurred on 1 November 2002. The robbery resulted in the death of Robert Saiz (Saiz). The State charged multiple parties, including Defendant, and Defendant's uncle, Louis McLean, in the robbery. In a pretrial motion dated 16 September 2003, Defendant moved to compel Louis McLean's counsel to disclose to

the trial court and to Defendant's counsel "the substance of any and all conversations and/or communications that [Louis McLean's counsel] have had with the co-defendant Louis McLean." In his motion, Defendant asserted that the communications between Louis McLean and Louis McLean's counsel concerned the culpability of a third-party and were not protected by attorney-client privilege pursuant to our Supreme Court's decisions in *In re Investigation of Death of Eric Miller*, 357 N.C. 316, 584 S.E.2d 772 (2003) (*Miller I*), and *In re Investigation of Death of Eric Miller*, 358 N.C. 364, 595 S.E.2d 120 (2004) (*Miller II*). Defendant requested that the trial court require counsel for all co-defendants to file an affidavit, to be reviewed *in camera*, revealing what their clients had said to them.

The trial court held a hearing regarding Defendant's motion on 3 November 2003. Counsel for each co-defendant was present at the hearing, and each indicated that their client did not waive the attorney-client privilege. The trial court ruled that the holdings of *Miller I* and *Miller II* were narrow and limited to situations in which the client was deceased. Since this was not the situation in the present case, the trial court denied Defendant's motion.

Decarus Vinson (Vinson), a supervisor at the sewer department, testified to the following: On the evening of 1 November 2002, Louis McLean worked for the sewer department on one of the night shift crews, and Vinson was his supervisor. Saiz was the supervisor of the other night shift crew working on the evening of 1 November 2002. Both crews were called out to a work site and returned to the sewer department at approximately 11:00 p.m. Louis McLean drove a separate truck to the site, and upon returning from the site, talked on the telephone. Several employees began "playing quarters" in the break room. At approximately 11:30 p.m., Vinson heard the door shaking. Thereafter, he heard shooting that "sounded like a pellet gun[.]" Saiz and another individual ran out of the room. Vinson laid down on the floor and "just kept [his] eyes on" the two men who had entered the room. Vinson testified that after Saiz and the other individual fled, the shooter fired two shots. Vinson stated that the shooter was wearing a "yellow shirt with writing on the side and something in the front." The second individual was smaller and wore a "hoodie[,]" a hooded sweatshirt. The shooter demanded wallets from the employees, and Vinson gave his wallet to the smaller man who was wearing the hoodie. Vinson saw three other employees give their wallets to the man. Vinson saw the two men leave the building, but the shooter re-entered the building, and then exited from another door.

Several people then called 911. Vinson left the building and saw Saiz lying on the ground outside. Saiz had a small red mark on his back, was spitting up blood, and gasping for air. Several days later, Vinson was presented with a photographic lineup and identified Defendant as the shooter.

Officer R.E. Nance (Officer Nance), with the canine unit of the Raleigh Police Department, testified that he responded to the sewer department on 1 November 2002 with his police dog. Officer Nance observed the dog respond in a way that suggested the dog had picked up a scent in the parking area outside the building. The dog became excited and led Officer Nance through a grassy area near the building where Officer Nance found a yellow shirt. Officer Nance notified another officer to secure the area and continued to follow the dog. Officer Nance and the dog continued for a few more feet and the dog located another shirt, "grayish or bluish" in color. Officer Nance noticed a strong odor of gunpowder coming from the shirt. The dog continued to lead Officer Nance forward, eventually to parking lots surrounding the Timberlake Apartments.

Two other members of the sewer department who were present during the robbery also testified. Johnny Moore (Moore) identified Defendant from a photo array as the shooter, and made an in-court identification of Defendant as the shooter. Lionel Dasy (Dasy) testified that Louis McLean and Saiz did not "like each other." Dasy also testified that after the employees were informed that Saiz had died, Louis McLean began deleting phone numbers in his cell phone. Dasy believed that someone who worked in the sewer department was involved with the robbery because it occurred near the end of the night shift, and on a Friday when employees were paid.

Ronald Newkirk testified that in November 2002, he lived in the Timberlake Apartments, which were located near the sewer department. He testified that he left his apartment close to midnight on 1 November 2002 to visit a friend who also lived in the apartment complex. He took his keys and his cordless apartment phone with him. While Newkirk was walking to his friend's apartment, he was approached by two young black men who asked to use his cell phone to call a cab. He told them he did not have a cell phone and directed them to a nearby pay phone. When presented with a photo array, Newkirk pointed out Defendant and said Defendant "appeared to look like" one of the men he talked with at the apartment complex.

The State presented additional testimony indicating that various calls were made from Louis McLean's cell phone to a pay phone located about fifteen minutes from the sewer department on the night of the shooting. The State also presented testimony regarding DNA evidence recovered from the yellow shirt that was found near the scene of the robbery.

Defendant testified that he was at his grandmother's house, where he lived, on the night of the robbery. He testified that he attended a party that his grandmother had for one of his uncles. This testimony was corroborated by other witnesses. Defendant presented conflicting DNA evidence and other evidence not relevant to the present appeal.

Defendant sought to offer the testimony of Dr. Brian Cutler (Dr. Cutler), chair of the Psychology Department at the University of North Carolina at Charlotte. The trial court conducted a *voir dire* of Dr. Cutler outside the presence of the jury. Dr. Cutler testified that over the course of his career he had studied "several aspects of eye-witness memory, including the reliability of eyewitness identification, factors that influence the reliability of identification, methods for improving identification accuracy and . . . the effectiveness of safeguards that are designed to protect defendants from erroneous conviction resulting from mistaken identification." He testified that he reviewed relevant police reports and a copy of a photo array at the request of Defendant.

Dr. Cutler testified that his research revealed three factors that could affect the accuracy of witness identifications: (1) the degree of stress experienced by a witness; (2) the presence of a weapon; and (3) the amount of time that a witness was able to view the perpetrator. Dr. Cutler testified that the specific identification procedures utilized could also affect the reliability of the identification, including whether a witness is given an instruction that the perpetrator may not be included in the array, and whether the different photographs are shown to a witness sequentially or simultaneously. Dr. Cutler prepared a report based upon his review of recommendations made by the National Institute of Justice and the North Carolina Actual Innocence Commission, the police reports, a photo array, and a review of the literature in the field. He opined that the identification procedures used in the investigation of Defendant did not conform to what he believed were the "best practices[.]"

During questioning by the State, Dr. Cutler testified that he had not interviewed the witnesses who identified Defendant. He also stated that he reviewed only one photo array and was told to assume that it was used in the identification of Defendant. Dr. Cutler also noted that he did not hear the in-court testimony of the witnesses who identified Defendant as the shooter, did not visit the sewer department, and was not aware of how close the witnesses were to the perpetrator.

After Dr. Cutler's *voir dire*, the State objected to the admission of Dr. Cutler's testimony. The State argued (1) that the probative value of Dr. Cutler's testimony was minimal; (2) that Dr. Cutler had reviewed a photo array not used by investigators; (3) that he had not interviewed any of the witnesses who identified Defendant as the shooter; and (4) that he had not visited the site of the robbery. The State argued the probative value of Dr. Cutler's testimony was outweighed by the potential prejudice to the State, and the likelihood of confusion to the jury pursuant to Rule 403. The trial court ruled that Dr. Cutler's testimony was not specific to the present case, and that the probative value was "marginally weak" even when viewed in the light most favorable to Defendant. The trial court also ruled that the testimony would confuse the jury, result in unnecessary delay in the proceeding, and would not be of significant assistance to the jury. The trial court sustained the State's objection and did not allow the testimony of Dr. Cutler to be presented to the jury.

[1] Defendant first argues the trial court improperly barred the expert testimony of Dr. Cutler regarding the identification procedures used. Defendant contends that Dr. Cutler's testimony would have assisted the jury in determining the reliability of the identifications of Defendant. We find no error in the trial court's decision to exclude this testimony.

The issue of expert testimony regarding eyewitness identification has previously come before this Court. In *State v. Cole*, 147 N.C. App. 637, 556 S.E.2d 666 (2001), *cert. denied*, 356 N.C. 169, 568 S.E.2d 619 (2002), we stated

this Court has previously addressed the issue of the admissibility of expert testimony on eyewitness identifications and has held that "the admission of expert testimony regarding memory factors is within the trial court's discretion, and the appellate court will not intervene where the trial court properly appraises proba-

tive and prejudicial value of the evidence under Rule 403 and the Rules of Evidence."

*Id.* at 642, 556 S.E.2d at 670 (quoting *State v. Cotton*, 99 N.C. App. 615, 621, 394 S.E.2d 456, 459 (1990)). Further, in *State v. Lee*, 154 N.C. App. 410, 417, 572 S.E.2d 170, 175 (2002), this Court upheld the trial court's decision to exclude expert testimony on identification procedures where the expert had not interviewed the victims, had not visited the crime scene, and had not observed the witnesses' trial testimony.

We find *Cole* and *Lee* controlling. Dr. Cutler did not interview the witnesses in this case, did not observe their trial testimony, and did not visit the crime scene. The trial court's ruling on this issue reflected these facts. The trial court further found that the probative value of the testimony, considering it in the light most favorable to Defendant, was "marginally weak" and that the evidence would confuse the jury, unnecessarily delay the proceeding, and would not be of significant assistance to the jury. We see no abuse of discretion and overrule this assignment of error.

[2] Defendant next argues that the trial court erred by denying Defendant's motion to compel disclosure of the statements made by his co-defendants to their respective attorneys. Defendant relies on our Supreme Court's opinions in *Miller I* and *Miller II*. The central issue is whether the holdings in the two *Miller* cases apply only to situations where the client is deceased.

In *Miller I*, the Court framed the issue before it as

whether, in the context of a pretrial criminal investigation, there can be a viable basis for the application of an interest of justice balancing test or an exception to the privilege which would allow a trial court to compel disclosure of confidential communications *where the client is deceased*, an issue of first impression for this Court.

*Miller I*, 357 N.C. at 318-19, 584 S.E.2d at 776 (emphasis added). Thus, from the first paragraph of its opinion, the Court limited its language to situations where the client is deceased. After summarizing the relevant facts of the case, the Court again stated:

In essence, this case presents the question of whether, during a criminal investigation, there can be a legal basis for the application of an interest of justice balancing test or an exception to the attorney-client privilege which would allow a trial court to com-

**STATE v. McLEAN**

[183 N.C. App. 429 (2007)]

pel the disclosure of confidential attorney-client communications *when the client is deceased.*

*Id.* at 321, 584 S.E.2d at 778 (emphasis added). Later in its opinion, the Court restated its holding, again limiting its language:

In summary then, we hold that *when a client is deceased,* upon a nonfrivolous assertion that the privilege does not apply, with a proper, good-faith showing by the party seeking disclosure of communications, the trial court may conduct an *in-camera* review of the substance of the communications. To the extent any portion of the *communications between the attorney and the deceased client* relate solely to a third party, such communications are not within the purview of the attorney-client privilege.

*Id.* at 342-43, 584 S.E.2d at 791 (first and third emphases added). The Court's language again limited its holding to situations where the client is deceased. Additionally, in *Miller II,* the Supreme Court reiterated "as a cautionary note that this very narrow exception to the attorney-client privilege should be appropriately limited both as to its scope and method of disclosure." *Miller II,* 358 N.C. at 370, 595 S.E.2d at 124.

Defendant cites several portions of *Miller I* for the proposition that *Miller I* does not apply only to situations where the client is deceased. We acknowledge that the Supreme Court did include language in *Miller I* which, when cited outside the context of the limiting language noted above, does not include the word "deceased[.]" *See Miller I,* 357 N.C. at 335-36, 584 S.E.2d at 786-87. We also acknowledge that the Supreme Court cited several cases in its opinion involving statements made to attorneys by clients who were not deceased. *See id.* However, we believe the language used by the Court to state the issue before it, and to summarize its holding, demonstrates that the Court intended to limit the scope of its opinion to situations where the client is deceased. Therefore, we overrule this assignment of error.

Defendant fails to argue his remaining assignments of error and we deem them abandoned pursuant to N.C.R. App. P. 28(b)(6).

No error.

Judges CALABRIA and STEPHENS concur.