IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-1163

Filed: 18 February 2020

Bladen County, No. 15CRS052092, 16CRS000028, 16CRS000030-31

STATE OF NORTH CAROLINA

v.

SHANIKA NICOLE MITCHELL, Defendant.

Appeal by Defendant from judgments entered 13 April 2018 by Judge Tanya T. Wallace in Bladen County Superior Court. Heard in the Court of Appeals 3 September 2019.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General Anne J. Brown, for the State.*
>
> *David Weiss for the Defendant.*

BROOK, Judge.

Shanika Nicole Mitchell ("Defendant") appeals from judgments entered upon jury verdicts finding her guilty of first-degree murder under the first-degree felony murder rule, attempted first-degree murder, felonious discharge of a firearm into an occupied vehicle in operation, and two counts of conspiracy to commit first-degree murder. Defendant alleges that the trial court committed plain error in admitting certain inferential testimony and character evidence, and that the evidence supported only one charge of conspiracy. We disagree that the trial court committed

plain error. However, we vacate the second conspiracy conviction and remand for resentencing because the State's evidence supported only one agreement among co-conspirators.

## I. Background

On 4 January 2016, Defendant was indicted on charges of first-degree murder, attempted first-degree murder, felonious discharge of a firearm into an occupied vehicle in operation, and two counts of conspiracy to commit first-degree murder stemming from a shooting that occurred on 8 November 2015.[1]

In the instant case, the State presented evidence at trial that the November 2015 shooting stemmed from a 2013 dispute that involved Defendant's brother, Montise Mitchell ("Mitchell"). In 2013, Mitchell was working at a Smithfield packing plant with Robert Council ("Robert"). Mitchell saw Robert talking to Mitchell's girlfriend. Mitchell waited for Robert in the parking lot one evening after work and started a fistfight. A few months later, Robert and his cousin Antwan Council ("Antwan") retaliated, starting a fistfight with Mitchell. After the 2013 incidents, the Council family had no contact with Mitchell until 2015.

On the afternoon of 8 November 2015, Mitchell dropped off Defendant and his girlfriend, D'Nazya Downing ("Downing"), at Defendant and Mitchell's home.

---

[1] The facts of this case are set out more fully in the appeal to this Court by Defendant's brother from his convictions for first-degree murder, attempted first-degree murder, and conspiracy to commit first-degree murder, which arose from the same incident. *See State v. Mitchell*, ___ N.C. App. ___, 822 S.E.2d 327, 2019 WL 190153, at *1 (2019) (unpublished).

Downing contacted Antwan to purchase marijuana. She and Defendant went to the home shared by Antwan and his brother Darrell Council ("Darrell"). While Darrell called someone to bring the marijuana, Defendant and Downing waited. Once the marijuana was delivered, Defendant and Downing left.

Then, between 5:00 and 5:30 p.m., Downing contacted Antwan about meeting to smoke the marijuana, and the brothers picked up Defendant and Downing. Accompanied by a friend of the Council brothers, Isiah Long ("Long"), the group returned to the brothers' house. They sat in the car as Defendant and Downing began texting Mitchell their whereabouts. Mitchell communicated with Defendant and Downing through a texting app. Defendant and Downing also texted each other while in the car. Soon thereafter, Mitchell texted Downing that he was going to shoot the brothers. Defendant, Downing, and Mitchell then began to text each other as to when the ambush would take place and to coordinate the location.

The text messages went back and forth between Defendant and Downing, with Downing informing Defendant of at least some portions of Mitchell's plan. Downing testified to the following exchange at trial. At 5:45 p.m., Downing texted:

> Downing: "Think [Mitchell] said gonna do it when they get ready to drop us off."
>
> Defendant: "Oh okay. Do it where??"
>
> Downing: "Idk [I don't know] you see any guns in here?"
>
> Defendant: "No."

> Defendant: "When [are] they drop[ping] us off? Where?"
>
> Downing: "At the house and [Mitchell] probably gonna be down the road somewhere, but I'm bout [sic] to see."
>
> Defendant: "We need to go yo [sic] way so they can sit in the cut somewhere."

At 6:53 p.m., Downing texted Defendant:

> "He told us don't leave yet and don't leave til [sic] about 7:40."
>
> Defendant: "I thought he said hurry up?"
>
> Downing: "He did[,] he said he ain't [sic] have all night, and I said [I] think [we] bout [sic] [to] be there in [a] few, and he said don't leave til [sic] like, 7:40."

Defendant, Downing, and the brothers sat in the car and smoked marijuana for another 40 minutes. At 7:29 p.m., Downing texted Defendant: "I think [Mitchell] [is] ready!!" Downing again texted Defendant: "[Mitchell] said just get dropped off [at your] house and when they leave from the house he gonna [sic] call us."

The brothers then drove Defendant and Downing to Defendant's house at Defendant and Downing's request. Once there, Defendant and Downing went inside. The brothers drove away. Within five minutes, Downing heard multiple gunshots. Darrell was shot and killed. Mitchell was later identified as a shooter.

Mitchell called Downing and told her and Defendant to come out of the house. Together, they drove to a Food Lion parking lot in Cameron, North Carolina, an hour away. Upon their arrival, family members picked up Defendant and Mitchell.

- 4 -

Mitchell then deleted the texting app he had been using and destroyed his phone. Mitchell also asked Downing to destroy her phone, but Downing refused.

Detective Thomas Morgan Johnson of the Bladen County Sheriff's Office investigated the death of Darrell and issued warrants for the arrests of Defendant, Downing, and Mitchell. A month later, Defendant and Mitchell were discovered in a neighboring county and arrested for the murder of Darrell.

On 13 April 2018, Defendant was tried and convicted by a jury in Bladen County Superior Court of first-degree murder, attempted first-degree murder, felonious discharge of a firearm into an occupied vehicle in operation, and two counts of conspiracy to commit first-degree murder.

Defendant was sentenced to life imprisonment with the possibility of parole for the first-degree murder conviction and sentenced to 125 to 162 months in prison for the attempted first-degree murder and conspiracy convictions. The trial court arrested judgment on the conviction for discharging a weapon into an occupied vehicle. Defendant appeals.

## II. Analysis

Defendant contends that the trial court committed plain error by admitting (1) speculative testimony of Downing, (2) improper inferential testimony of Downing and Detective Johnson, and (3) improper character evidence of the victim's good

character.  After addressing the applicable standard of review, we consider each of these contentions in turn.

## A. Standard of Review

Alleged evidentiary error to which a defendant does not object at trial may be reviewed only for plain error.  *State v. Lawrence*, 365 N.C. 506, 516, 723 S.E.2d 326, 333 (2012).

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial.  To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty.  Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affects the fairness, integrity or public reputation of judicial proceedings[.]

*Id.* at 518, 723 S.E.2d at 334 (internal marks and citations omitted).

## B. Testimony of Defendant's Knowledge of the Planned Shooting

We first consider whether the admission of Downing's testimony that Defendant knew her brother planned to shoot the Council brothers was error.  As we explain below, the admission of this testimony was error because the record reflects that it was outside Downing's personal knowledge.  However, we hold that the erroneous admission of this testimony was not plain error because it did not have "a probable impact on the jury's finding that the defendant was guilty."  *Id.*

North Carolina Rule of Evidence 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." N.C. Gen. Stat. § 8C-1, Rule 602 (2019). Personal knowledge includes what a witness saw, *see generally State v. Tuck*, 173 N.C. App. 61, 69-70, 618 S.E.2d 265, 271-72 (2005) (witness had personal knowledge of robber by looking through his mask and personally observing him); what a witness heard, *see generally State v. Wright*, 151 N.C. App. 493, 496, 566 S.E.2d 151, 153-54 (2002) (witness had personal knowledge that victim was shot because witness heard the gunshot from an adjoining room); what a witness smelled, *see generally State v. Norman*, 213 N.C. App. 114, 119-20, 711 S.E.2d 849, 855 (2011) (testimony deemed proper where witness testified that defendant seemed impaired where, among other observations, witness testified to smelling the odor of alcohol on Defendant); what a witness feels, knows, or believes regarding his or her own mind, *see generally State v. Cole*, 147 N.C. App. 637, 645, 556 S.E.2d 666, 671 (2001) (witness had personal knowledge of how certain she was of her own testimony); and what a witness learns from other reliable sources, *see generally State v. Watson*, 179 N.C. App. 228, 245, 634 S.E.2d 231, 242 (2006) (witness investigator had personal knowledge that defendant did not have a brother by conducting research).

However, a lay witness generally may not testify as to the contents of another person's mind without providing a foundation to support that testimony. For

example, testimony that a witness's wife was familiar with certain corporate financial records violated Rule 602 because the witness did not provide a foundation supporting the assertion. *Lee v. Lee*, 93 N.C. App. 584, 587, 378 S.E.2d 554, 556 (1989). Additionally, testimony that a defendant acted with a particular purpose, without establishing that the witness has personal knowledge of the defendant's purpose, violates Rule 602. *See State v. Harshaw*, 138 N.C. App. 657, 662, 532 S.E.2d 224, 227 (2000) (holding admission of testimony in violation of Rule 602 was not prejudicial, however, because other evidence at trial supported the State's theory of premeditation and deliberation).[2]

Defendant contends that two instances of Downing's testimony constituted inadmissible evidence under Rule 602. First, Downing testified that when she texted Defendant that Mitchell was "gonna do it when they get ready to drop us off[,]" she did not explain to Defendant what "it" was because she "was aware just like I was . . . of the situation," referring to Mitchell's intent to shoot the Council brothers. Similarly, Defendant challenges the admission of Downing's affirmative response to

---

[2] Relatedly, under North Carolina Rule of Evidence 701 lay witnesses may not testify to their inferences unless based on their rational perceptions. N.C. Gen. Stat. § 8C-1, Rule 701 (2019). For example, testimony by a witness that her husband sold drugs out of a back bedroom and that the defendant went into the back bedroom with her husband has been held to constitute an inadequate factual foundation to support the witness's further testimony that the defendant bought drugs from her husband in the back bedroom where the witness did not observe the sale. *State v. Wilkerson*, 363 N.C. 382, 414-15, 683 S.E.2d 174, 194-95 (2009) (holding that admission of speculative testimony not prejudicial in light of other evidence against defendant).

the State's question "that both [Downing] and [Defendant] knew that [Mitchell] was going to shoot at Darrell and Antwan?"

Downing did not testify about the basis for her knowledge that Defendant was aware that Mitchell had planned a shooting. For example, she did not testify regarding any messages she saw between Mitchell and Defendant suggesting that Mitchell told Defendant the plan, nor did she testify regarding anything Defendant said that indicated that she was aware of the planned shooting. Without such foundation, Downing's testimony that Defendant "was aware just like [Downing] was" aware of the planned shooting was speculative and inadmissible under Rule 602.

Defendant asserts that, without this testimony, "the jury had little basis to conclude [Defendant] was aware the confrontation would be anything more than a fist fight between feuding young men"; we must consider whether the improper admission amounts to plain error. The evidence showed that Defendant was aware of and involved in the plan to ambush the Council brothers. Defendant concedes as much, contending that the evidence did not support a finding that Defendant was aware that the ambush *involved firearms*. Although Downing provided the only direct testimony that Defendant was aware Mitchell was planning a shooting—and not merely a fistfight—the State provided additional circumstantial evidence that Defendant assisted in planning and carrying out the ambush; that she knew her

brother planned to shoot the Councils; and that she therefore "counseled or knowingly aided" the underlying felony, shooting into an occupied vehicle. As we explain below, the circumstantial evidence is sufficient to rebut Defendant's plain error argument.

First, the State presented evidence that Defendant was communicating with both Downing and Mitchell and that she had endeavored to hide these communications from the Council brothers and Long. The jury heard testimony that Defendant was using her phone to communicate with both Downing and Mitchell throughout the afternoon she spent with the Council brothers, and that she was holding her cellphone "real close to her body" and "hid[ing]" it in such a way that Antwan and Long could not see what she was communicating or with whom. While Downing was in the car with the Council brothers, she asked Defendant via text whether she saw any guns. Downing also texted Defendant, "Think [Mitchell] said gonna do it when they get ready to drop us off." Defendant did not ask Downing what "it" meant in reply; instead, Defendant responded, "Oh okay. Do it where?[,]" whereupon Downing replied, "At the house and [Mitchell] probably gonna be down the road somewhere[.]" Defendant told Downing, "We need to go yo way so they can sit in the cut somewhere." Downing testified that she understood "in the cut" to mean that Mitchell would be hiding out to ambush the Council brothers when they passed in their car.

Second, the State presented additional evidence to support its theory that Defendant participated in the conspiracy both immediately before and immediately after her brother shot at the Council brothers. When the brothers dropped Defendant off at her house, Antwan testified that he knew something bad was going on when he told Defendant, "see you later" and she replied, "You ain't got to worry about that." Less than five minutes later, Mitchell shot at the Council brothers and killed Darrell. Shortly after Mitchell shot and killed Darrell, he met Downing and Defendant outside the house he shared with Defendant, and they drove to Cameron, North Carolina.

Finally, the State presented evidence supporting the jury's findings that not only was Defendant aware of and involved in a conspiracy to ambush the Council brothers, but also Defendant knew her brother planned to use a gun in the ambush. When Detective Johnson interviewed Defendant for the second time, on 10 November 2015, Defendant told him that, while Downing knew that the Council brothers would be shot, Defendant only knew that "something" was going to happen when she got to the Councils' house. Further, the jury heard testimony that Defendant knew that the Council brothers were going to drop her and Downing off by car, and that her brother would be hiding down the road. This evidence supports the narrative presented by the State that the jury chose to credit — that the planned ambush was more than merely the latest episode of fisticuffs between Mitchell and the Council brothers.

From this evidence, a jury could reasonably determine that Defendant "counseled or knowingly aided" the underlying felony, shooting into an occupied vehicle, by assisting in luring the Council brothers to the stakeout spot. We cannot say that Defendant has established that the jury probably would have reached a different result without considering Downing's speculative testimony. While Downing's testimony was speculative and its admission was error, we hold that its admission did not constitute plain error.

### C. Testimony Regarding Cellphone Technology

Defendant alleges that the trial court committed plain error when it permitted Downing and Detective Johnson "to testify, without foundation, that [Defendant] concealed evidence using a smartphone texting app." As explained below, we agree that the admission of this testimony was error, but we hold that it did not rise to the level of plain error.

Rule 701 of the North Carolina Rules of Evidence provides that

> [i]f the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

N.C. Gen. Stat. § 8C-1, Rule 701 (2019). When questioning calls for testimony based on opinion or inference, a foundation must first be laid that the testimony is rationally based on the lay witness's perception. *Matheson v. City of Asheville*, 102 N.C. App.

156, 174, 402 S.E.2d 140, 150 (1991) ("As there was no foundation showing that the opinion called for was rationally based on the witness's perception, the opinion was inadmissible."); *see also State v. Givens*, 95 N.C. App. 72, 79, 381 S.E.2d 869, 873 (1989) (holding admission of officer's testimony that "scales were common drug paraphernalia" violated Rule 701 because there was no showing in the record that the officer had "a basis of personal knowledge for his opinion.") (internal marks omitted).

Downing testified that she had seen Defendant use an application on her smartphone to text with her brother, Mitchell. The following exchange took place between the prosecutor and Downing at trial:

> [PROSECUTOR]: And, to your knowledge, if you're trying to hide communications, could you go through an app and it wouldn't show up on your cell phone records?
>
> [DOWNING]: Yes, sir.
>
> [PROSECUTOR]: So if [Defendant] was texting or if [Mitchell] was also texting [Defendant] and he did it on an app, then it wouldn't appear on these records? If they were trying to hide that conversation, it would appear on an app that you could get rid of?
>
> [DOWNING]: Yes, sir.
>
> [PROSECUTOR]: But your cell phone records, you can't get rid of those? Those are saved?
>
> [DOWNING]: Yes, sir.

Because of the leading nature of these questions, the State laid no foundation regarding how Downing was familiar with the data retention questions at issue. These affirmative responses require inferential leaps about what cellphone records contain, how the use of apps impacts cell phone records, and the effect deleting any particular app would have on the data that app contained. While there are myriad ways to rationally connect a witness's perceptions to his or her inferences, the State made no efforts to do so with Downing, instead simply asking leading questions. Without the required foundation, Downing's testimony about the cellphone technology and the records it generated was inadmissible.

Detective Johnson testified that he received certain cellphone data from Defendant's cellphone company, U.S. Cellular. He testified that he did not see any records of communications between Defendant and Mitchell on the date of the shooting. The following exchange then took place between the prosecutor and Detective Johnson:

> [PROSECUTOR]: And, to your knowledge, if you know, that network, that company only preserves texts that are sent on their network; is that right?
>
> [DET. JOHNSON]: That is correct.
>
> [PROSECUTOR]: So if a message is sent using an app or some third party, would U.S. Cellular have access to that?
>
> [DET. JOHNSON]: No, they would not.

As illustrated above, the foundation for Detective Johnson's testimony about U.S. Cellular's preservation policies and U.S. Cellular's ability to access messages sent using an app was inadequate. For example, the State did not establish that Detective Johnson had ever seen the cellphone records from this particular telecommunications company before conducting this investigation; that Detective Johnson knew how U.S. Cellular preserves its cellphone records; or that Detective Johnson had any knowledge about U.S. Cellular's ability to access data sent through an app or third party. The leading nature of these questions again prevented the State from laying the necessary foundation and, as such, Detective Johnson's above testimony was inadmissible.

Having concluded that the admission of the aforementioned portions of Downing's and Detective Johnson's testimony regarding Defendant's cellphone records were error, we turn to whether they amounted to plain error. The jury heard testimony from Downing that she knew Defendant was communicating with Mitchell on her phone because Downing saw messages on Defendant's screen appear with Mitchell's name. The jury also heard testimony that Downing had observed Defendant communicate with Mitchell via a smartphone app and not through the normal text messaging function. The jury then heard Detective Johnson testify that Defendant's phone records revealed no communications between Defendant and Mitchell during the relevant time frame. Even excluding the inadmissible evidence

offered by Downing and Detective Johnson, the jury was left to square the fact that they had heard testimony indicating Defendant was communicating with her brother via cellphone; that her brother had destroyed his cellphone; and that there were no records reflecting their communication. The jury could have resolved this tension in a manner disadvantageous to Defendant. Given the reasonable inferences arising from admissible testimony, along with the other evidence of guilt discussed more fully above, we cannot say that the jury probably would have reached a different result absent the inadmissible testimony.

### D. Evidence of Victim's Good Character

Defendant contends that "[t]he trial court committed plain error by admitting irrelevant testimony about the good character of the victim." We agree that the testimony was admitted in error, but we hold that it did not amount to plain error.

Rule 404(a) of the North Carolina Rules of Evidence provides that evidence of a person's character is generally not admissible to prove "that he acted in conformity therewith on a particular occasion[.]" N.C. Gen. Stat. § 8C-1, Rule 404(a) (2019). The Rule provides, however, that "[e]vidence of a pertinent trait of character of the victim of the crime" is admissible if "offered by an accused, or by the prosecution to rebut the same[.]" *Id.* § 8C-1, Rule 404(a)(2). The prosecution also may offer "evidence of a character trait of peacefulness of the victim in a homicide case to rebut evidence that

the victim was the first aggressor[.]" *Id.*; *see also State v. Faison*, 330 N.C. 347, 354-55, 411 S.E.2d 143, 147 (1991).

Here, Defendant did not offer any evidence that Darrell was the first aggressor, that Mitchell acted in self-defense, or that Mitchell was in any way justified in shooting and killing Darrell. Regardless, the State introduced evidence through the testimony of Long that Darrell was kind, protective, and the kind of person who would "give you the clothes off his back." Long testified further that Darrell was part of a motorcycle club called "Bikes Up/Guns Down," which he testified was

> a movement, man. We'd rather see you on a dirt bike or a four-wheeler riding than have a pistol in your hand or somebody in the corner selling drugs, man. It was a movement to try to uplift the community to keep young black men and just young people in general out of the way, you know, out of *this* situation.

(Emphasis in original). He testified further that Darrell was "[n]onviolent."

This testimony was inadmissible under Rule 404(a)(2) because it was not offered to rebut any testimony offered by Defendant that Darrell was the first aggressor in the altercation between Mitchell and the Council brothers. We therefore conclude that the admission of this testimony was error.

However, the admission of evidence of the victim's nonviolent character did not rise to the level of plain error. Given the evidence consistent with Defendant's guilt discussed above, we cannot say that the jury probably would not have convicted Defendant had it not heard that Darrell was nonviolent.

E. Conspiracy

Finally, Defendant argues, and the State concedes, that the trial court erred in allowing the jury to convict her of two counts of conspiracy. We agree.

"According to North Carolina law, a criminal conspiracy is an agreement by two or more persons to perform either an unlawful act or a lawful act in an unlawful manner." *State v. Wilson*, 106 N.C. App. 342, 345, 416 S.E.2d 603, 605 (1992). "To determine whether single or multiple conspiracies are involved, the essential question is the nature of the agreement or agreements, but factors such as time intervals, participants, objectives, and number of meetings all must be considered." *Id*. (internal marks and citation omitted). "When the evidence shows a series of agreements or acts constituting a *single* conspiracy, a defendant cannot be prosecuted on multiple conspiracy indictments consistent with the constitutional prohibition against double jeopardy." *State v. Medlin*, 86 N.C. App. 114, 121, 357 S.E.2d 174, 178 (1987) (emphasis in original).

Here, the evidence presented at trial established the existence of one agreement between Defendant, Downing, and Mitchell. Their agreement involved determining a location and a specific time for the ambush to occur. While the shooting involved two potential victims, the State did not present sufficient evidence of two separate agreements to support the second conspiracy conviction. *See Mitchell*, ___ N.C. App. at ___, 822 S.E.2d at 327, 2019 WL 190153, at *3 ("Here, the evidence at

trial only was sufficient to show a single agreement . . . that Mitchell conspired with D'Nazya Downing, Shanika Mitchell, and the second shooter to ambush and shoot Darrell and Antwan Council in their car.").

Therefore, we must vacate the second conspiracy conviction and remand for resentencing.

## III. Conclusion

Even considering the above evidentiary errors cumulatively, we cannot say that they had a probable impact on the jury's findings. *See State v. Hembree*, 368 N.C. 2, 20, 770 S.E.2d 77, 89 (2015) (considering the cumulative prejudicial effect of errors at trial). While we hold that the admission of speculative testimony that Defendant knew of the planned shooting, the insufficiently supported inferences drawn by Downing and Detective Johnson, and the improper character evidence of the victim's peacefulness were error, we cannot conclude that the jury probably would have reached a different result absent this inadmissible testimony. Accordingly, we find no error in part, vacate in part, and remand for resentencing only.

NO ERROR IN PART; VACATED IN PART AND REMANDED.

Chief Judge McGEE concurs.

Judge BRYANT concurs in the result.