STROUD, Judge.
 

 *591
 
 Ralph Lewis Gettys ("defendant") appeals from judgments entered after a jury found him guilty of second-degree murder, possession of a firearm by a felon, and simple assault. Defendant contends that the trial court erred in (1) denying his motion to strike the jury venire; (2) admitting a recording of a police interview and allowing a police detective to read from a transcript of that recording; and (3) denying defendant's request for a special jury instruction on sequestration. We find no error.
 

 *592
 
 I. Background
 

 In the early hours of 15 December 2012, defendant worked as a bouncer at a "liquor house" in Charlotte. Defendant patted down customers for firearms, among whom were Joshua Lampkins and Raymona Abraham. Around 5:00 a.m. or 6:00 a.m., defendant told his brother that he wanted to leave the liquor house. Defendant's brother gave him the keys to his car, which he had parked down the street, so that defendant could move the car in front of the liquor house and then they could leave together. Defendant's ex-girlfriend, Teshalla Dunlap, accompanied defendant as he walked down the street to the car.
 

 *354
 
 With Dunlap as a passenger, defendant drove the car back up the street and parked it in front of the liquor house. When defendant and Dunlap got out of the car, Lampkins and Abraham confronted them and claimed that defendant had hit Lampkins with the car. Lampkins and Abraham demanded that defendant pay them fifty dollars, and when defendant refused, they threatened to attack him. When the conflict escalated, Dunlap walked toward the liquor house to tell defendant's brother to come outside. During the confrontation, defendant shot and killed Abraham and beat Lampkins unconscious. As part of the investigation of the homicide, Detectives Carter and Greenly interviewed Dunlap and recorded the interview.
 

 On or about 7 January 2013, a grand jury indicted defendant for murder, possession of a firearm by a felon, and simple assault.
 
 See
 
 N.C. Gen.Stat. §§ 14-17, -33(a), -415.1 (2011). At trial, defendant moved to strike the petit jury venire, but the trial court denied his motion. On 16 January 2014, the jury found defendant guilty of second-degree murder, possession of a firearm by a felon, and simple assault. The trial court sentenced defendant to 339 to 419 months' imprisonment for the second-degree murder offense, 21 to 35 months' imprisonment for the possession of a firearm by a felon offense, and 60 days of imprisonment for the simple assault offense. The trial court ordered that defendant serve the second-degree murder sentence and possession of a firearm by a felon sentence consecutively and serve the simple assault sentence concurrently. Defendant gave notice of appeal in open court.
 

 II. Motion to Strike the Jury Venire
 

 Defendant first contends that the trial court erred in denying his motion to strike the jury venire. Defendant alleges that his venire was racially disproportionate to the demographics of Mecklenburg County and therefore deprived him of his constitutional right to a jury of his peers.
 

 *593
 
 A. Standard of Review
 

 We review alleged violations of constitutional rights
 
 de novo.
 

 State v. Graham,
 

 200 N.C.App. 204
 
 , 214,
 
 683 S.E.2d 437
 
 , 444 (2009),
 
 appeal dismissed and disc. review denied,
 

 363 N.C. 857
 
 ,
 
 694 S.E.2d 766
 
 (2010).
 

 B. Analysis
 

 Our state and federal Constitutions protect a criminal defendant's right to be tried by a jury of his peers. This constitutional guarantee assures that members of a defendant's own race have not been systematically and arbitrarily excluded from the jury pool which is to decide his guilt or innocence. However, the Sixth Amendment does not guarantee a defendant the right to a jury composed of members of a certain race or gender.
 

 The burden is upon the defendant to show a
 
 prima facie
 
 case of racial systematic exclusion. In order for a defendant to establish a
 
 prima facie
 
 violation for disproportionate representation in a venire, he must show the following:
 

 (1) that the group alleged to be excluded is a "distinctive" group in the community;
 

 (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community;
 
 and
 

 (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.
 

 State v. Jackson,
 

 215 N.C.App. 339
 
 , 341-42,
 
 716 S.E.2d 61
 
 , 64 (2011) (emphasis added and citations, quotation marks, and brackets omitted) (quoting
 
 Duren v. Missouri,
 

 439 U.S. 357
 
 , 364,
 
 99 S.Ct. 664
 
 , 668-69,
 
 58 L.Ed.2d 579
 
 , 587 (1979) ).
 

 A single venire that fails to proportionately represent a cross-section of the community does not constitute systematic exclusion.
 
 See
 

 State v. Williams,
 

 355 N.C. 501
 
 , 549-50,
 
 565 S.E.2d 609
 
 , 638 (2002),
 
 cert. denied,
 

 537 U.S. 1125
 
 ,
 
 123 S.Ct. 894
 
 ,
 
 154 L.Ed.2d 808
 
 (2003). "The fact that a particular jury or a series of juries does not statistically reflect the racial composition of the community does not in itself make out an invidious discrimination forbidden by the Equal Protection Clause."
 
 Jackson,
 

 215 N.C.App. at 343
 
 ,
 
 716 S.E.2d at 65
 
 (brackets omitted). Systematic exclusion occurs
 
 *594
 
 when
 
 *355
 
 a procedure in the venire selection process consistently yields non-representative venires.
 
 See
 

 Duren,
 

 439 U.S. at 366-67
 
 ,
 
 99 S.Ct. at 669-70
 
 ,
 
 58 L.Ed.2d at 588-89
 
 (holding that a venire selection process favoring female exemption from jury duty constituted systematic exclusion).
 

 Defendant argues that Mecklenburg County's computer program, Jury Manager, generated a racially disproportionate venire and thus deprived him of a jury of his peers. Defendant relies on
 
 Turner v. Fouche,
 

 396 U.S. 346
 
 , 359,
 
 90 S.Ct. 532
 
 , 539-40,
 
 24 L.Ed.2d 567
 
 , 578 (1970). But in interpreting
 
 Turner,
 
 our Supreme Court noted:
 

 [T]he United States Supreme Court did not conclude that the
 
 prima facie
 
 case was solely based upon the disparity of representation of African-Americans in the jury venire. Rather, that Court's conclusion ultimately rested upon the finding that the underrepresentation was the result of the systematic exclusion of African-Americans in the jury-selection process. Under our interpretation of
 
 Turner,
 
 merely showing a disparity under the second prong of the
 
 Duren
 
 test, standing alone, will not establish a
 
 prima facie
 
 case of disproportionate representation.
 

 State v. Bowman,
 

 349 N.C. 459
 
 , 469,
 
 509 S.E.2d 428
 
 , 434 (1998) (citation omitted),
 
 cert. denied,
 

 527 U.S. 1040
 
 ,
 
 119 S.Ct. 2403
 
 ,
 
 144 L.Ed.2d 802
 
 (1999). Although defendant asserts that there is a disparity under the second prong of
 
 Duren
 
 , he concedes the absence of systematic exclusion under the third prong. Because defendant has failed to satisfy the third
 
 Duren
 
 prong, systematic exclusion, we hold that the trial court did not err in denying defendant's motion to strike the jury venire.
 

 Id.,
 

 509 S.E.2d at
 
 434-35 ;
 
 see also
 

 Williams,
 

 355 N.C. at 549-50
 
 ,
 
 565 S.E.2d at
 
 638 ;
 
 State v. Avery,
 

 299 N.C. 126
 
 , 134-35,
 
 261 S.E.2d 803
 
 , 808-09 (1980).
 

 III. Admission of Evidence
 

 Defendant argues that the trial court erred in admitting the recording of Dunlap's police interview for both corroboration and impeachment. Defendant further contends that the trial court erred in allowing Detective Carter to read portions of the transcript of that recording. We find no error in either circumstance.
 

 A. Standard of Review
 

 The standard of review for this Court assessing evidentiary rulings is abuse of discretion. A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have
 
 *595
 
 been the result of a reasoned decision. The abuse of discretion standard applies to decisions by a trial court that a statement is admissible for corroboration.
 

 State v. Tellez,
 

 200 N.C.App. 517
 
 , 526,
 
 684 S.E.2d 733
 
 , 739 (2009) (citations and quotation marks omitted). We also review for an abuse of discretion a trial court's decision to admit a statement for impeachment.
 
 State v. Banks,
 

 210 N.C.App. 30
 
 , 38,
 
 706 S.E.2d 807
 
 , 814 (2011).
 

 Relying on
 
 Sherrod v. Nash General Hospital, Inc.,
 
 defendant argues that the proper standard for reviewing a trial court's decision to admit a statement for corroboration is
 
 de novo.
 

 See
 

 126 N.C.App. 755
 
 , 762,
 
 487 S.E.2d 151
 
 , 155 (1997),
 
 aff'd in part and rev'd in part,
 

 348 N.C. 526
 
 ,
 
 500 S.E.2d 708
 
 (1998). But there, this Court did not discuss a trial court's ruling on whether evidence was admissible for corroboration; rather it discussed a trial court's ruling on whether evidence was relevant under N.C. Gen.Stat. § 8C-1, Rule 401.
 

 Id.,
 

 487 S.E.2d at 155
 
 . Accordingly, we hold that
 
 Sherrod
 
 is inapposite.
 

 B. Corroboration and Impeachment
 

 The prior consistent statements of a witness may be offered at trial for corroborative, nonhearsay purposes. Corroborative testimony is testimony which tends to strengthen, confirm, or make more certain the testimony of another witness. In order to be corroborative and therefore properly admissible, the prior statement of the witness need not merely relate to specific facts brought out in the witness's testimony at trial, so long as the prior statement in fact tends to add weight
 
 *356
 
 or credibility to such testimony. The trial court has wide latitude in deciding when a prior consistent statement can be admitted for corroborative, nonhearsay purposes.
 

 State v. Duffie,
 
 --- N.C.App. ----, ----,
 
 772 S.E.2d 100
 
 , 104 (2015) (citations and quotation marks omitted). "Prior statements of a witness which are inconsistent with his present testimony are not admissible as substantive evidence because of their hearsay nature. Even so, such prior inconsistent statements are admissible for the purpose of impeachment."
 
 State v. Bishop,
 

 346 N.C. 365
 
 , 387,
 
 488 S.E.2d 769
 
 , 780 (1997) ;
 
 see also
 
 N.C. Gen.Stat. § 8C-1, Rule 607 (2013). "[I]mpeachment evidence has been defined as evidence used to undermine a witness's credibility, with any circumstance tending to show a defect in the witness's perception, memory, narration or veracity relevant to this purpose."
 
 State v. Allen,
 

 222 N.C.App. 707
 
 , 721,
 
 731 S.E.2d 510
 
 , 520 (citations, quotation
 
 *596
 
 marks, and brackets omitted),
 
 appeal dismissed and disc. review denied,
 

 366 N.C. 415
 
 ,
 
 737 S.E.2d 377
 
 (2012),
 
 cert. denied,
 
 - -- U.S. ----,
 
 133 S.Ct. 2009
 
 ,
 
 185 L.Ed.2d 876
 
 (2013).
 

 A trial court may admit evidence for both corroboration and impeachment.
 
 See
 

 State v. Ayudkya,
 

 96 N.C.App. 606
 
 , 610,
 
 386 S.E.2d 604
 
 , 606-07 (1989) (holding that a pretrial statement that supported a witness's direct testimony but contradicted his cross-examination testimony was admissible to either corroborate or impeach, "whichever the jury found"). "Where a witness's prior statement contains facts that manifestly contradict his trial testimony, however, such evidence may not be admitted under the guise of corroborating his testimony."
 
 State v. Alexander,
 

 152 N.C.App. 701
 
 , 704,
 
 568 S.E.2d 317
 
 , 319 (2002) (quotation marks omitted). Additionally, this Court in
 
 Ayudkya
 
 cautioned that courts must apply carefully this combination of the evidentiary rules of corroboration and impeachment; otherwise, a party could introduce "almost any out-of-court statement made by a witness."
 
 Ayudkya,
 

 96 N.C.App. at 610
 
 ,
 
 386 S.E.2d at 606-07
 
 .
 

 Here, the trial court admitted the recording of Dunlap's police interview for both corroboration and impeachment. Before admitting the recording, the trial court carefully reviewed the transcript of the recording and addressed defendant's concern that the State had called Dunlap as a witness only to introduce her prior inconsistent statements, which would have been otherwise inadmissible as hearsay:
 

 Now, as I understand what happened here, the State put on the witness. I would-I don't think the State expected [Dunlap] to not say something consistent. What she said was 90 percent consistent with what she said before. This is not a case where the State has put on a witness the State knows has changed his or her story, that the State doesn't reasonably expect to testify about what the witness said before for the pure purpose of pre-textually getting in that prior statement.
 

 As a matter of fact, here the State has put on a witness who has testified largely consistent[ly] with what she said.
 

 The trial court also gave a limiting instruction to the jury before the recording was played to them:
 

 Ladies and gentleman, you're going to hear evidence of Ms. Dunlap's earlier statement to the police in the
 
 *597
 
 interview. I instruct you that you must not consider this earlier statement as evidence of the truth of what was said at that earlier time because the earlier statement was not made under oath at this trial. If you believe that the earlier statement was made and that any portions of the earlier statement conflict with or are consistent with the testimony of Ms. Dunlap at this trial, you may consider these prior statements and all other facts and circumstances bearing upon Ms. Dunlap's truthfulness in deciding whether you will believe or disbelieve Ms. Dunlap's testimony at this trial.
 

 The trial court later included a similar limiting instruction in the jury charge:
 

 Evidence has been received tending to show that at an earlier time a witness made a statement which may conflict or be consistent with the testimony of the witness
 
 *357
 
 at this trial. You must not consider such earlier statement as evidence of the truth of what was said at that earlier time because it was not made under oath at this trial.
 

 If you believe the earlier statement was made and that it conflicts or is consistent with the testimony of the witness at this trial, you may consider this and all other facts and circumstances bearing upon the witness's truthfulness in deciding whether you will believe or disbelieve the witness's testimony.
 

 In light of the trial court's abundance of caution as demonstrated in its conscientious review of the transcript of the recording and its limiting instructions, we hold that under
 
 Ayudkya,
 
 the trial court did not abuse its discretion in admitting the recording for both corroboration and impeachment.
 
 See
 

 Ayudkya,
 

 96 N.C.App. at 610
 
 ,
 
 386 S.E.2d at
 
 606-07 ;
 
 Tellez,
 

 200 N.C.App. at 527-28
 
 ,
 
 684 S.E.2d at 740-41
 
 (approving of a similar limiting instruction).
 

 Defendant contends that admitting the recording for both corroboration and impeachment is "logically contradictory and counterintuitive." But the State did not introduce a single pretrial statement for both corroboration and impeachment; rather, it introduced a recording of Dunlap's police interview, which included many pretrial statements, some of which tended to corroborate Dunlap's testimony and some of which tended to impeach her testimony.
 

 *598
 
 Defendant relies on
 
 State v. Frogge
 
 for the proposition that prior contradictory statements do not corroborate a witness's testimony and may not be admitted under such a theory.
 
 See
 

 345 N.C. 614
 
 , 618,
 
 481 S.E.2d 278
 
 , 280 (1997). But
 
 Frogge
 
 is distinguishable, because here, the State proffered and the trial court admitted Dunlap's pretrial statements for both corroboration and impeachment purposes.
 

 Defendant next attempts to distinguish
 
 Ayudkya.
 
 There, the pretrial statement corroborated the witness's direct testimony "although it tended to impeach his cross-examination testimony."
 
 Ayudkya,
 

 96 N.C.App. at 610
 
 ,
 
 386 S.E.2d at 606
 
 . Defendant argues that
 
 Ayudkya
 
 is distinguishable, because "the State was not offering Ms. Dunlap's previous statement[s] ... in an attempt to rehabilitate her by corroborating her direct testimony and impeaching her cross-examination testimony." But nothing in
 
 Ayudkya
 
 suggests that its holding is limited to this particular situation.
 
 See
 

 id.,
 

 386 S.E.2d at 606-07
 
 . Following
 
 Ayudkya,
 
 we hold that the trial court did not err in admitting the recording of the police interview for both corroboration and impeachment purposes.
 
 See
 

 id.,
 

 386 S.E.2d at 606-07
 
 .
 

 C. Reading from Transcript
 

 Defendant also contends that the trial court's decision to allow Detective Carter to read aloud portions of the transcript that the State believed were not clearly audible from the recording intruded upon the province of the jury. But because Detective Carter was one of the detectives who interviewed Dunlap, she had personal knowledge of the interview. An individual who has personal knowledge of a matter may testify directly about that matter at trial.
 
 See
 
 N.C. Gen.Stat. § 8C-1, Rule 602 (2013) ;
 
 State v. Cole,
 

 147 N.C.App. 637
 
 , 645,
 
 556 S.E.2d 666
 
 , 671 (2001),
 
 appeal dismissed and disc. review denied,
 

 356 N.C. 169
 
 ,
 
 568 S.E.2d 619
 
 (2002). Here, Detective Carter merely read or clarified statements that had been made in her presence. Additionally, the trial court gave the following limiting instruction to the jury:
 

 Ladies and gentleman, I will instruct you that-I will instruct you that you need to listen as carefully as you can and not give any greater weight to those portions of the statement that Detective Carter reads than you give to the portions of the statement that you only hear. I instruct you to treat them all-all without regard to whether you only heard them on the [recording] or also heard the detective say them.
 

 *599
 
 Because Detective Carter had personal knowledge of Dunlap's interview, we hold that the trial court did not err by allowing her to read from the transcript and clarify portions of the recording to the jury.
 
 See
 
 N.C. Gen.Stat. § 8C-1, Rule 602 ;
 
 Cole,
 

 147 N.C.App. at 645
 
 ,
 
 556 S.E.2d at 671
 
 .
 

 *358
 
 IV. Jury Instruction Request
 

 Defendant finally contends that the trial court erred by denying his request for a special jury instruction on sequestration. N.C. Gen. Stat § 1-181 provides:
 

 (a) Requests for special instructions to the jury must be-
 

 (1) In writing,
 

 (2) Entitled in the cause, and
 

 (3) Signed by counsel submitting them.
 

 (b) Such requests for special instructions must be submitted to the trial judge before the judge's charge to the jury is begun. However, the judge may,
 
 in his discretion,
 
 consider such requests regardless of the time they are made.
 

 (c) Written requests for special instructions shall, after their submission to the judge, be filed as a part of the record of the same.
 

 N.C. Gen. Stat § 1-181 (2013) (emphasis added).
 

 In closing argument, the prosecutor argued:
 

 [Defendant is] cherry-picking the best parts of everybody's story after he's had a year to think about it and after he's had a year-or after he's had the entire trial to listen to what everybody else would say. You'll notice that our witnesses didn't sit in here while everybody else was testifying.
 

 In response, defendant made two requests for a special jury instruction on sequestration. Defendant first orally requested an instruction before the trial court read the jury charge, and the trial court responded that it would examine the requested instruction when defendant submitted it in writing. This initial request was not written and thus did not satisfy subsection (a)(1).
 
 See
 

 id.
 

 §§ 1-181(a)(1), 15A-1231(a) (2013) ;
 
 State v. McNeill,
 

 346 N.C. 233
 
 , 240,
 
 485 S.E.2d 284
 
 , 288 (1997) ("[A] trial court's ruling denying requested instructions is not error where the defendant
 
 *600
 
 fails to submit his request for instructions in writing."),
 
 cert. denied,
 

 522 U.S. 1053
 
 ,
 
 118 S.Ct. 704
 
 ,
 
 139 L.Ed.2d 647
 
 (1998).
 

 Defendant later renewed his request in writing after the jury had been charged and had left the courtroom to begin its deliberations. The request was for the following instruction:
 

 In this case, all witnesses allowed by law were sequestered at the request of the State. These witnesses could not be present in court except to testify until they were released from their subpoenas, or to discuss the matter with other witnesses or observers in court.
 

 By law, the defendant and lead investigator for the State cannot be sequestered.
 

 This written request satisfied N.C. Gen. Stat § 1-181(a)(1), but we analyze the trial court's decision under subsection (b), because defendant made the written request
 
 after
 
 the jury was charged; accordingly, we review for an abuse of discretion.
 
 See
 
 N.C. Gen. Stat § 1-181(b). "A trial court may be reversed for an abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision."
 
 Tellez,
 

 200 N.C.App. at 526
 
 ,
 
 684 S.E.2d at 739
 
 .
 

 In denying defendant's written request, the trial court properly exercised its discretion:
 

 THE COURT:.... I don't think this instruction is required. I don't think this instruction goes to any issue that is going to be dispositive or even close to dispositive in this case. And I agree with [the State] that, you know, sometimes if the Court forgets an instruction or a pattern instruction in something that's given in every case, you have to call the jury back in because you forgot it. But for a special instruction that I was not inclined to give, to call them back in-I do think it would give undue-
 

 [Defendant's counsel]: I had only put this in, to be honest, Your Honor-you had already ruled, in my opinion. I just simply put this in because the rules of procedure say there has to be a copy. And so I did not-to be honest, I hadn't expected you to give it. I simply wanted to put it in the record[.]
 

 *601
 
 Given that the requested instruction did not relate to a dispositive issue in the case, we
 
 *359
 
 hold that the trial court did not abuse its discretion in denying defendant's request.
 
 [1]
 

 V. Conclusion
 

 For the foregoing reasons, we hold that the trial court committed no error.
 

 NO ERROR.
 

 Judges CALABRIA and TYSON concur.
 

 [1]
 

 We note that the prosecutor's argument did not violate defendant's constitutional right to presence.
 
 See
 

 Portuondo v. Agard,
 

 529 U.S. 61
 
 , 73,
 
 120 S.Ct. 1119
 
 , 1127,
 
 146 L.Ed.2d 47
 
 , 59 (2000) ("In sum, we see no reason to depart from the practice of treating testifying defendants the same as other witnesses. A witness's ability to hear prior testimony and to tailor his account accordingly, and the threat that ability presents to the integrity of the trial, are no different when it is the defendant doing the listening. Allowing comment upon the fact that a defendant's presence in the courtroom provides him a unique opportunity to tailor his testimony is appropriate-and indeed, given the inability to sequester the defendant, sometimes essential-to the central function of the trial, which is to discover the truth.").